731 A.2d 868

**Kenneth READ**

v.

**SUPERVISOR OF ASSESSMENTS OF
ANNE ARUNDEL COUNTY.**

**No. 148, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 13, 1999.

Reconsideration Denied June 25, 1999.

384

Alan Hilliard Legum (Alan Hilliard Legum, P.A., on brief), Annapolis, for appellant.

William K. Hammond, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

This case presents two issues of first impression before this Court: the effect of the withdrawal and subsequent sale, closely related in time, of property subject to a Forest Conservation and Management Agreement and the applicability of the step transaction doctrine. Because the Tax Court proper-

ly upheld the imposition of a rollback tax with respect to appellant's withdrawal and conveyance of property subject to a Forest Conservation and Management Agreement, we shall affirm.

## I.  Facts

In 1972, appellant Kenneth F. Read and his now deceased wife, Sondra D. Read, entered into a Forest Conservation and Management Agreement (FCMA or agreement) with the Department of Forests and Parks, which is a part of the Department of Natural Resources (DNR),[1] involving appellant's 34.5 acre tract of waterfront woodland area located in Anne Arundel County.  This agreement provided that appellant's property tax assessment on the tract of land would be frozen during the term of the agreement, which was four years.[2]  In return, appellant agreed to preserve his property in its wooded state under a woodland management plan developed by the Department of Natural Resources.  Under the past and current provisions of the FCMA program, if FCMA property or a portion thereof is conveyed to another owner and the agreement is not assumed by the new owner, that portion of the conveyed property would be reassessed at market value and a rollback tax imposed.[3]

---

1.  The Department of Forests and Parks came under the DNR by Legislative act in 1969. *See* 1969 Md. Laws, Chap. 154, § 8; Md.Code (1957, 1967 Repl.Vol., 1969 Cum.Supp.), Art. 66C, § 343.  The current Forest and Park Service, a unit operating under the auspices of the DNR, was created by the combining of the Forest Service and the Park Service in 1982. *See* 1982 Md. Laws, Chap. 184; Md.Code (1973, 1997 Repl.Vol.), § 5–202.  We shall refer to the Department of Forests and Parks interchangeably as the Department of Natural Resources or DNR throughout this opinion.

2.  The original FCMA was entered into pursuant to Maryland Code (1957, 1966 Cum.Supp.), Article 66C, section 411½, the predecessor to present Maryland Code (1985, 1994 Repl.Vol., 1998 Cum.Supp.), section 8–211 of the Tax–Property Article.

3.  Neither party contests the imposition of a rollback tax generally or the computation used in determining the amount of the rollback tax.

Appellant renewed the agreement for a period of ten years on July 17, 1976. The FCMA was amended in 1980 to reflect the withdrawal of a one-acre home site from the agreement, thereby reducing the FCMA acreage to 33.5 acres.[4] In 1983, appellant renewed the FCMA for a twenty-year term beyond the previous expiration year of 1986 to 2006. Additionally, the acreage was reduced by 0.4 acres, the site of six existing cabins, which decreased the acreage subject to the FCMA to approximately 33 acres.[5]

In 1986, appellant began subdividing an area covered by the agreement. The subdivision was approved in 1989. In 1988, section 8–211 was amended to "clarify" that an owner's removal of land from the FCMA prior to the expiration of the agreement would not enable the owner to avoid the rollback tax. *See* Md.Code (1985, 1994 Repl.Vol., 1998 Cum.Supp.), § 8–211(i)(1)(iv) of the Tax–Property Article.[6] Appellant and his wife received notification of this amendment in 1988 or 1989.

In 1990, the FCMA again was amended to reflect a decrease in acreage because appellant had sold and conveyed a subdivided lot (lot three) from the property subject to the FCMA. A rollback tax was imposed pursuant to section 8–211(i)(1)(iii). Appellant paid the rollback tax.[7]

Two other Cherrystone lots were listed for sale by a realtor in March 1991. Sales contracts were executed for lot four on

---

4. This withdrawal is not in dispute in this case.

5. This withdrawal likewise is not in dispute in this case.

6. All statutory references shall be to the Tax–Property Article unless otherwise indicated.

7. Appellant initially contested the State's right to impose a rollback tax on the 1989 conveyance on essentially the same argument presented in this case, as he claimed he had withdrawn this property prior to conveyance. The Tax Court found, however, that the lot had not been withdrawn but had been conveyed outright while under the FCMA. The Court of Special Appeals affirmed in an unreported opinion. That conveyance and imposition of the rollback tax is not at issue in this appeal.

December 30, 1991, and on lot two on February 7, 1992. After the contracts for sale were formalized, appellant's attorney drafted two letters to DNR, one on July 23, 1992, and the other on August 12, 1992, requesting DNR to withdraw lots two and four, respectively, from the FCMA. Thus, at the time of withdrawal, the sales contracts had been executed. Shortly thereafter, lot two was conveyed on July 30, 1992, for $385,000 and lot four was conveyed on November 13, 1992, for $500,000. The assessed value on the lots with the frozen assessment woodland basis would have been $2,668 for lot two and $3,289 for lot four. The FCMA subsequently was amended formally in January of 1993 to reflect appellant's withdrawal of three lots, including lots two and four. The Supervisor of Assessments of Anne Arundel County (Supervisor), appellee, imposed a rollback tax for two of the lots for the period 1972 to 1992, in the amount of $38,695.70 for lot two and $39,358.55 for lot four. This tax was imposed based upon the Supervisor's determination that the lots were sold prior to their withdrawal from the FCMA because they were sold before the agreement amending the FCMA was signed in January 1993.

Appellant paid the taxes assessed but requested a refund. The Supervisor denied the refund request and affirmed the assessment. Appellant appealed to the Maryland Tax Court. There he claimed that the rollback tax should not have been assessed because he had withdrawn lots two and four before they were sold based on the letters submitted by his attorney in 1992; therefore, he alleged, the amendment to the FCMA should have been retroactive to the requests for withdrawal made in July and August 1992. Appellant also argued the 1988 amendment was inapplicable to his FCMA and an unconstitutional impairment of his contract. The Tax Court affirmed the Supervisor's denial in an October 28, 1994, order and found that the lots had been conveyed prior to the January 1993 amendment to the FCMA. Appellant then sought judicial review in the Circuit Court for Anne Arundel County. That court affirmed the Tax Court in a written opinion and order dated September 7, 1995.

Appellant appealed the circuit court's judgment to the Court of Special Appeals. In an unreported opinion, that court held that appellant's removal of the lots from the FCMA was effective retroactively to the date of the letters requesting removal. Turning to the issue of whether the 1988 statutory amendment applied to appellant, the court stated that under the pre–1988 law, appellant could not be assessed the rollback taxes if the lots were withdrawn from the FCMA prior to sale. Because the Tax Court had not addressed the Contract Clause issue, the Court of Special Appeals reversed and remanded the case for factual determinations to be made regarding the application of the 1988 amendment to appellant's FCMA.

Upon remand, the Tax Court found that the 1988 amendment to section 8–211 did not unjustifiably impair appellant's contract rights. Appellant again sought judicial review in the circuit court and that court affirmed. Appellant noted an appeal to the Court of Special Appeals and presented the following question:

> Did the 1988 amendment of Md.Code Ann., Tax–Prop. § 8–211(h) [sic] by the Maryland Legislature constitute an unconstitutional impairment of the Appellant's existing contractual rights under a 1983 Forest Conservation and Management Agreement with the Maryland Department of Natural Resources?

This Court issued a writ of certiorari on its own motion before the Court of Special Appeals heard arguments to consider the important issues raised by this appeal.

We shall affirm the judgment of the circuit court, but for reasons articulated differently than those stated by the Tax Court, the circuit court, and proffered by the parties in their briefs.[8] We hold that the Contract Clause is not impli-

---

8. The findings the Tax Court made as to the contract impairment question, with respect to the appellant's expectations prior to the 1988 amendment, albeit stated somewhat differently, *infra*, are consistent with our opinion. The Tax Court found that appellant's obligations and expectations were not changed or impaired by the 1988 statutory amendment. We agree. We are holding that under the step transac-

cated here because, regardless of the effect of the 1988 amendment to section 8–211, withdrawals of property from the FCMA for the purpose of a conveyance to a new owner always have been subject under the statute to the rollback tax, whether the tax actually had been imposed or not. By applying the step transaction doctrine, the transactions by appellant in subdividing his property, listing the lots with a realtor, accepting sales contracts, withdrawing the property from the agreement, and conveying the property without transferring the FCMA obligations to the buyer all constituted essential and interdependent parts of the conveyances on July 30 and November 13, 1992. When appellant withdrew his property from the FCMA, he did so with the intent to convey the property, an act subject to the rollback tax under the statute. Accordingly, because the 1988 amendment had no effect on appellant's contract with the state, we need not address the constitutional issue raised by appellant.

## II. Discussion

### A. Standard of Review

■ We begin by noting the appropriate standard of review. The Maryland Tax Court is an administrative agency. *See Prince George's County v. Brown,* 334 Md. 650, 658 n. 1, 640 A.2d 1142, 1146 n. 1 (1994). Maryland Code (1988, 1997 Repl.Vol.), section 13–532(a) of the Tax–General Article, provides that the final order of the Tax Court is subject to judicial review as provided in sections 10–222 and 10–223 of the State Government Article, which govern the standard of review for decisions of administrative agencies. The standard of review for Tax Court decisions are generally the same as that for other administrative agencies. Accordingly,

---

tion doctrine, the obligations appellant now complains of, the assessment of rollback taxes, pre-existed the 1988 amendment. Accordingly, there was no impairment. Additionally, no material facts are in dispute. In light of our acceptance of the step transaction doctrine's applicability to the undisputed facts of the case, further remand to the Tax Court for it to re-articulate its reasoning is unnecessary.

[u]nder this standard, a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law. *See, e.g., Supervisor of Assess. v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984); *Comptroller v. Mandel Re–Election Com.,* 280 Md. 575, 374 A.2d 1130 (1977). On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision.

*Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985). Furthermore, the reviewing court may not substitute its own judgment for that of the Tax Court if supported by substantial evidence. *See CBS Inc. v. Comptroller of the Treasury,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990); *Rouse–Fairwood Ltd. Partnership v. Supervisor of Assessments,* 120 Md.App. 667, 685, 708 A.2d 19, 27 (1998); *see also Comptroller of the Treasury v. Disclosure, Inc.,* 340 Md. 675, 682–83, 667 A.2d 910, 913 (1995); *Director of Finance v. Charles Towers Partnership,* 104 Md.App. 710, 716–17, 657 A.2d 808, 812 (1995), *aff'd sub nom., Chesapeake & Potomac Tel. Co. v. Director of Finance,* 343 Md. 567, 683 A.2d 512 (1996). There is no substantive dispute as to the facts of this case. The appeal before us, therefore, presents only a question of law in which we must interpret the provisions of the statute at issue at the time appellant entered into the FCMA, the step transaction doctrine, and the legal effect of appellant's multiple transactions in subdividing, listing, selling, withdrawing, and conveying lots two and four.

### B. Statutory Interpretation

Before we discuss the applicable rule of law, we turn first to the canons of statutory construction. We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought in the first instance in the actual language of· the statute. *Marriott Employees Fed. Credit*

*Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

■■■■ In *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992), however, this Court opined, in construing an alimony statute:

> While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

When there is a "lack of relevant legislative history, we must rely substantially on the language of the statutes in the context of the goals and objectives they seek to achieve." *Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632, 566 A.2d 94, 97 (1989) (citing *Kaczorowski,* 309 Md. at 513–16, 525 A.2d at 632–33). Finally,

> where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider

not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. . . . [T]he court . . . may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730, 732 (1986) (citations omitted).

The legislative history for the original statutory provision enacting the FCMA program is sparse. Nonetheless, the language of the statute, when read in conjunction with its broad purpose to protect the environmental and economic interests of the landowners, the State, and the people of Maryland makes clear that the Legislature did not intend land subject to an FCMA to be withdrawn and promptly conveyed to a new owner without either the transfer of the obligations of the agreement or the imposition of rollback taxes.

The Conservation of Woodland Areas program was created by legislative enactment in 1963. The Act provided that the program was

designed to encourage the people of this State to keep or develop lands for productive woodland purposes, to increase the income of the citizens of the State from the sale of timber, to prevent floods and the wasting of the State's soil, to provide open and wooded areas for the use and enjoyment of residents and sojourners in this State, and to promote the welfare and assets of the people of Maryland.

1963 Md. Laws, Chap. 884, § 1. The 1963 enactment provided a general scheme under which landowners could contract with the DNR for the tax assessment value of woodland areas to be frozen for the period of the contract in exchange for complying with a forest conservation and management program. *See id.* The statute also mandated that

[a]t the end of the period covered by the contract, or at the time part or all of the timber is harvested, or at the time part or all of the tract is conveyed to a new owner, whichev-

er is the earliest date, there shall be a new valuation of the tract, or portion thereof.

*Id.* If only a portion of the tract were harvested or conveyed, the new valuation would be assessed proportionately. *Id.* The statute went on to provide that although a tract of land subject to the agreement could be conveyed without the new valuation made and rollback tax assessed, this was possible only if the FCMA were transferred to the buyer and the buyer assumed the obligations of the contract. *Id.* The statute was silent as to withdrawals of property when there was no evidence of intent to convey the property.[9]

As we read Chapter 884, notwithstanding that no other provisions specifically forbade the withdrawal of property from the FCMA, the Legislature clearly intended to deter the premature conveyance of property subject to the agreement by mandating that a rollback tax be assessed. The tax, however, would not be assessed if the property were conveyed subject to the agreement. By assessing the rollback tax to landowners who conveyed property subject to the agreement before the agreement terminated, the State provided an incentive for the landowners to uphold their end of the contract in protecting the woodland areas while receiving the cost-saving benefit of a frozen tax assessment. The Legislature permitted the conveyance of property subject to the agreement without the imposition of the rollback taxes if the contractual obligations were transferred to the buyer. Such provisions demonstrated the Legislature's intent to deter sale of property subject to an agreement without transferring that agreement's obligations to the buyer. Failure to abide by this resulted, and still results under present section 8–211 of the Tax–Property Article, in the imposition of a rollback tax. Therefore, any conveyance of property subject to the FCMA, free of its restrictions, results in the assessment of rollback taxes.

---

**9.** Section 8–211 was amended by 1994 Md. Laws, Chap. 435, to authorize the transfer of certain property under a FCMA, subject to restrictions, to the child of the owner without incurring a penalty for withdrawal. *See* § 8–211(k). This provision is not at issue in the case *sub judice.*

In 1988, the Legislature passed an amendment to address the perceived problem of landowners' attempts to subvert the imposition of rollback taxes by withdrawing property from the agreement and then conveying it. The amendment provided that a woodland area covered by the FCMA shall be reassessed, that is, a rollback tax imposed, any time the agreement is ended "at the request of the owner." 1988 Md. Laws, Chap. 179, § 1; § 8–211(i)(1)(iv). This provision, the Legislature explained, "clarifie[d] the rights and obligations of landowners having Forest Conservation and Management Agreements with the Department of Natural Resources." House State Economic and Environmental Affairs Committee, Bill Analysis for House Bill 209 (1988). Appellant argues that because this amendment was enacted subsequent to the 1986 renewal of his FCMA, the application of the amendment and accompanying rollback tax assessment violates the Contract Clause of the United States Constitution.

Regardless of whether the 1988 amendment applies to appellant's agreement, his conveyances of lots two and four were subject to the rollback tax. This is true because even though appellant withdrew the lots from the agreement before the date of the actual conveyances, all of the transactions entered into by appellant before and after the withdrawal, when stepped together, were made in furtherance of the conveyances to the buyers without transferring appellant's obligations under the agreement. Therefore, for purposes of the assessment of the rollback tax and under the circumstances of this case, appellant's withdrawal, as we shall explain, was made with the purpose of completing already contracted-for sales and conveyances. Such transactions are, and have always been, subject to the rollback tax under the statute.

### C. The Step Transaction Doctrine

The Supreme Court and the federal circuits long have recognized the principle that form will not prevail over substance in federal tax matters. That is, taxpayers cannot escape tax liability by disguising the true nature of transac-

tions with mere formalisms. In *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 612, 58 S.Ct. 393, 394, 82 L.Ed. 474 (1938), the issue before the Supreme Court was whether petitioner's delivery of cash to stockholders, who thereafter paid an equal sum of cash toward petitioner's debts, constituted a distribution pursuant to the Internal Revenue Code. The Court explained that the Code established

> that, in respect of any cash received and not "distributed," there was a taxable gain to petitioner. And, quite as plainly, payment of the debts by petitioner, if made directly by petitioner to the creditors, would not have been a distribution under the statute; for that contemplates a distribution to stockholders, and not payment to creditors. If, then, petitioner had followed the simple course of retaining in its own hands the sum here in question, and subsequently paying it directly to the creditors, it necessarily would result that liability of petitioner for a tax on the amount of gain could not be avoided. And, obviously, this is the effect of what was done, although circuitously.

*Id.* at 612–13, 58 S.Ct. at 394, 82 L.Ed. 474. The Court went on to hold that even though petitioner took a "roundabout process," it achieved the same benefit it would have received had it retained the amount of the distribution and applied that sum to reduce its indebtedness. *Id.* at 613, 58 S.Ct. at 395, 82 L.Ed. 474. The Court concluded that "[p]ayment of indebtedness, and not distribution of dividends, was, from the beginning, the aim of the understanding with the stockholders and was the end accomplished by carrying that understanding into effect. *A given result at the end of a straight path is not made a different result because reached by following a devious path." Id.* (emphasis added). *See also Gregory v. Helvering*, 293 U.S. 465, 469, 470, 55 S.Ct. 266, 267, 268, 79 L.Ed. 596 (1935) (noting that although "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted," allowing sham transactions to escape tax liability would "exalt artifice above reality.").

The Court later clarified this axiom in *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945):

> *The incidence of taxation depends upon the substance of a transaction.* The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. *Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.* A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Emphasis added.] [Footnote omitted.]

The "step transaction doctrine," as the principle later was to become known, was specifically recognized by the Supreme Court in *Commissioner v. Clark*, 489 U.S. 726, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). In that case the Court examined a substantial cash payment made in connection with a stock-for-stock exchange to determine whether it had the effect of a distribution of a dividend and was taxable as ordinary income or whether it was subject to capital gains. The Court reviewed the language and history of the Internal Revenue Code provision at issue, applied "a commonsense understanding of the economic substance of the transaction," and declared that a determination whether the exchange had the effect of distributing a dividend should be resolved "by examining the effect of the exchange as a whole." *Id.* at 738, 109 S.Ct. at 1462, 103 L.Ed.2d 753. Going on, the Court stated:

> Our reading of the statute as requiring that the transaction be treated as a unified whole is reinforced by the well-established "step-transaction" doctrine, a doctrine that the Government has applied in related contexts, see, *e.g.,* Rev. Rul. 75–447, 1975–2 Cum. Bull. 113, and that we have expressly sanctioned, see *Minnesota Tea Co. v. Helvering,*

302 U.S. 609, 613, 58 S.Ct. 393, 394, 82 L.Ed. 474 (1938); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction." 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4–52 (1981).

*Id.* at 738, 109 S.Ct. at 1462–63, 103 L.Ed.2d 753.

The federal circuit courts of appeal have explicitly recognized and applied the step transaction doctrine, recognizing three tests used to determine whether transactions should be "stepped" together and considered not as isolated incidents, but as components in an overall plan. *See, e.g., Kornfeld v. Commissioner*, 137 F.3d 1231 (10th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 171, 142 L.Ed.2d 139 (1998); *G.M. Trading Corp. v. Commissioner*, 121 F.3d 977 (5th Cir.1997); *Greene v. United States*, 13 F.3d 577 (2d Cir.1994); *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517 (10th Cir.1991); *Brown v. United States*, 782 F.2d 559 (6th Cir. 1986); *Security Indus. Ins. Co. v. United States*, 702 F.2d 1234 (5th Cir.1983); *McDonald's Restaurants v. Commissioner*, 688 F.2d 520 (7th Cir.1982); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652 (5th Cir.1968); *Penrod v. Commissioner*, 88 T.C. 1415, 1987 WL 49335 (1987); *King Enters., Inc. v. United States*, 189 Ct.Cl. 466, 418 F.2d 511 (1969). In *Associated Wholesale Grocers*, 927 F.2d at 1522, the Court of Appeals for the Tenth Circuit identified the "end result," "interdependence," and "binding commitment" tests. Although the end result and interdependence tests are the most frequently used, *see id.*, federal courts have not required the taxpayer to meet all three nor have many courts applied all three. *See Kornfeld*, 137 F.3d at 1235; *Greene*, 13 F.3d at 583–85; *Associated Wholesale Grocers*, 927 F.2d at 1523. Nonetheless, although there are distinct differences between

each of the step transaction tests, "each is faithful to the central purpose of the step transaction doctrine; that is, to assure that tax consequences turn on the substance of a transaction rather than on its form." *King Enters.*, 418 F.2d at 517.

The narrowest and most seldom applied test, the binding commitment test, *see Kornfeld*, 137 F.3d at 1235; *Associated Wholesale Grocers*, 927 F.2d at 1522 n. 6, provides that a transaction will be stepped together if, at the first step of the transaction, a binding commitment was entered into to undertake later steps. *See Penrod*, 88 T.C. at 1429. The test is of limited applicability because it appears to have been formulated to address a transaction that spanned several tax years. *See McDonald's Restaurants*, 688 F.2d at 525. Another court has described the Supreme Court's application of this test as limited to the circumstances of that case and further noted the Court gave no indication that it intended the binding commitment test to be "the touchstone of the step transaction doctrine in tax law." *King Enters.*, 418 F.2d at 518 (discussing *Commissioner v. Gordon*, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968)).

The interdependence test, a variation on the end result test, focuses on whether the steps in the transaction are so interdependent that "the legal relations created by one transaction would have been fruitless without a completion of the series." *Greene*, 13 F.3d at 584; *Associated Wholesale Grocers*, 927 F.2d at 1523; *Penrod*, 88 T.C. at 1430. The interdependence test concentrates on the relationship between all of the steps. *Associated Wholesale Grocers*, 927 F.2d at 1523; *Penrod*, 88 T.C. at 1430. In applying this test, courts must look at whether each individual step had some " 'independent significance or whether they had meaning only as part of the larger transaction.' " *Greene*, 13 F.3d at 584 (quoting *Penrod*, 88 T.C. at 1430).

The end result test amalgamates purportedly separate transactions when it appears they actually were prearranged parts of " 'a single transaction intended from the

outset to be taken for the purpose of reaching the ultimate result.' " *Associated Wholesale Grocers,* 927 F.2d at 1523 (quoting *King Enters.,* 418 F.2d at 516). This test is based upon the initial intent of the parties. *Penrod,* 88 T.C. at 1430. What is more, even though the initial arrangement between the parties need not be legally binding, there must be some "showing of an informal agreement or understanding." *Greene,* 13 F.3d at 583.

Several state courts have adopted the step transaction doctrine.[10] *See, e.g., Penner v. County of Santa Barbara,* 37 Cal.App.4th 1672, 44 Cal.Rptr.2d 606 (1995); *McMillin–BCED/Miramar Ranch North v. County of San Diego,* 31 Cal.App.4th 545, 37 Cal.Rptr.2d 472 (1995); *Shuwa Invs. Corp. v. County of Los Angeles,* 1 Cal.App.4th 1635, 2 Cal. Rptr.2d 783 (1991); *Noddings Inv. Group, Inc. v. Capstar Communications, Inc.,* 1999 WL 182568 (Del.Ch.1999); *Koch v. Commissioner,* 33 Mass.App.Ct. 707, 605 N.E.2d 301 (1992), *rev'd on other grounds,* 416 Mass. 540, 624 N.E.2d 91 (1993); *Lehmann v. Upper Cape Cod Reg'l Vocational Technical School Dist. Comm.,* 17 Mass.App.Ct. 283, 457 N.E.2d 666 (1983); *Hutton v. Johnson,* 956 S.W.2d 484 (Tenn.1997). Notably, many of these cases adopted and applied the step transaction doctrine in matters other than income tax or corporate mergers. *See, e.g., Lehmann,* 17 Mass.App.Ct. at 284, 457 N.E.2d at 668 (applying the step transaction doctrine to hold that a school district improperly reduced a teacher's salary); *Hutton,* 956 S.W.2d at 489 (evaluating whether two transactions involving the purchase of jet aircraft should be considered one stepped together transaction for purposes of personal property taxation).

The California Court of Appeal in *McMillin–BCED,* 31 Cal.App.4th at 550, 37 Cal.Rptr.2d at 474, applied the step transaction doctrine in a property tax matter to hold a series

---

**10.** The doctrine was recognized by the Court of Special Appeals in *Hercules, Inc. v. Comptroller of the Treasury,* 117 Md.App. 29, 54, 699 A.2d 461, 472 (1997), *rev'd on other grounds,* 351 Md. 101, 716 A.2d 276 (1998).

of transactions had established that a 100% change in owner-ship occurred in favor of McMillin and, therefore, it was not entitled to a refund of paid property taxes. In *McMillin–BCED*, BCE Development Properties, Inc. (Properties), a wholly-owned subsidiary of BCE Development, Inc. (Development), agreed in May 1989 to sell to McMillin/Scripps Ranch, a limited partnership for which the sole general partner was McMillin Communities, Inc. (McMillin), the subject 1200 acres of land for $100 million. The agreement fell through, however, because McMillin/Scripps Ranch could not secure financing and did not want to incur liabilities arising from any predevelopment activities on the land. The court described the subsequent steps in the transactions:

> Development then decided to develop the land with the assistance of an experienced residential developer. The following transactions ensued: As of January 26, 1990, title to the land was still held by Development. On that date, Development and Properties formed (but did not fund) a general partnership called Scripps Ranch. The partnership agreement required Development to contribute 30 percent tenancy-in-common interest in the land and Properties to contribute 70 percent tenancy-in-common interest in the land to the newly-formed partnership, as initial capital contributions. Profits and losses were to be shared in the same proportions. Four days later, Development conveyed a 70 percent tenancy-in-common interest in the land to Properties. For purposes of discussion, we shall refer to the tenancy-in-common transfer between Development and Properties as Step 1.

> On February 7, 1990, Development and Properties, as tenants-in-common, refinanced the land for $50 million. They executed a promissory note and deeds of trust in favor of their lender, Mortgage Development Corporation (MDC), which was, like Development, a wholly-owned subsidiary of BCE Canada. MDC immediately assigned the note to yet another wholly-owned subsidiary of BCE Canada, BCED Pacific, Inc. In a declaration prepared by Jeffrey H. Wagner, the director of taxation of the BCED corporations,

submitted in support of the McMillin–BCED opening trial brief, the purpose for this loan was explained: "(a) to strengthen and improve [Development's] interest in the Land by becoming a secured lender and (b) to reduce the amount of equity in the Land a future developer/investor would be required to 'buy into.'" We shall refer to this transaction, the refinancing of the land by Development and Properties as tenants-in-common, as Step 2.

Step 3 also took place on February 7, 1990, when Development and Properties deeded their respective interests in the land to the Scripps Ranch partnership, as required by the partnership agreement. In other words, they exchanged their 30–70 percent interests in the land for general partnership interests which would own the land. This structure would provide flexibility to negotiate a particular financial deal with a developer. The Scripps Ranch partnership assumed the loan on a non-recourse basis.

Development then carried out negotiations with McMillin, as well as a competing developer, Davidson Communities, Inc. (Davidson), to establish terms for a partnership agreement. On February 9, 1990, the Scripps Ranch partnership and McMillin entered into a contribution agreement establishing the terms and conditions for McMillin's admission as a partner and Development's withdrawal from the partnership. Development agreed to guarantee the performance of all of Properties' present and future obligations to McMillin under the partnership agreement. McMillin agreed to contribute $5 million cash to the partnership. Properties' capital account was valued at $30 million. Development assigned its 30 percent partnership interest to, and withdrew from, the partnership.

The effective date of the first amended and restated agreement of general partnership was February 12, 1990. Step 4 thus took place when McMillin bought into the appellant partnership. Two days later, the partnership name was changed from Scripps Ranch to McMillin–BCED. Pursuant to this agreement, McMillin now held a 14 percent interest in the capital of the partnership, a 30 percent

interest in the profits, and a 50 percent management interest.

*Id.* at 551–52, 37 Cal.Rptr.2d at 475 (footnote omitted) (alteration in original). The county assessor later reassessed the property, claiming a 100% change in ownership had occurred on February 12, 1990.

Before determining whether the four steps should have been stepped together, that is, treated as one transaction that transferred 100% ownership subject to reassessment, the court decided that only one of the three tests need be satisfied in order to apply the step transaction doctrine. The court explained that an earlier California case involving nearly the same issue and applying the step transaction doctrine, *Shuwa Investments Corp.*, 1 Cal.App.4th 1635, 2 Cal.Rptr.2d 783, did not address whether all three tests were required or the satisfaction of only one or two of the tests was sufficient. *McMillin–BCED,* 31 Cal.App.4th at 555, 37 Cal.Rptr.2d at 477. The *McMillin* court then examined comments by the courts in *King Enterprises* and *Associated Wholesale Grocers.* In *King Enterprises,* as we noted above, that court stated that although there are differences in each of the step transaction tests, each test "is faithful to the central purpose of the step transaction doctrine." *McMillin–BCED,* 31 Cal.App.4th at 555, 37 Cal.Rptr.2d at 477 (quoting *King Enters.,* 418 F.2d at 517). The Court of Appeal for the Tenth Circuit in *Associated Wholesale Grocers* had found the satisfaction of only one of the tests, the interdependence test, adequate to apply the step transaction doctrine. *McMillin–BCED,* 31 Cal.App.4th at 555, 37 Cal.Rptr.2d at 477–78. Accordingly, the court concluded, "the step transaction doctrine may be applied upon an adequate showing that one or more of the applicable tests is satisfied by the facts presented." *Id.* at 556, 37 Cal.Rptr.2d at 478.

The court next analyzed the facts under each of the tests. The facts of that case did not satisfy either the end result and binding commitment tests. First, both the tests seemed to require the same parties to pursue the same or related intent throughout the steps of the transaction. There was no evi-

dence that McMillin, which joined the partnership in step four, desired the same end result or had the same ultimate purpose and intent in the transaction as the partnership formed by Development and Properties. Furthermore, Development and Properties had independent, legitimate business purposes for each of the transactions in steps one through three of protecting their financial interests in the property. Finally, the transaction was not stretched out over a period of years, which seemed implicitly required by the Tenth Circuit in *Associated Wholesale Grocers*, 927 F.2d at 1522–23 n. 6, to apply the binding commitment test.

The court then turned to the interdependence test. Applying findings made by the trial court, the court concluded that all of the steps were implemented with the goal of McMillin's development of the land:

> The trial court pointed out at trial that it was significant that in a series of transactions closely related in time, McMillin as an outsider came in to assume all of the entitlement of one of the partners, at specified percentages of capital and profit. The profit was directly related to the percentage of ownership of the third party's predecessor, Development. The way in which this was accomplished was that Development assigned its percentage interest to the partnership, and McMillin then made a $5 million capital contribution and obtained a 14 percent capital interest in the partnership, along with a 30 percent profit interest and a 50 percent management interest. The history of this transaction includes the failed sale to McMillin at an earlier time. A reasonable inference may be drawn that McMillin's goals would not have been accomplished as a developer without the transfer of title from Development, through Properties, to the Scripps Ranch partnership, and ultimately to the appellant McMillin–BCED partnership. Even if Development and Properties had internal corporate reasons as affiliates to transfer title among themselves, refinance the property, and create a development partnership, those steps would essentially have been fruitless had they not been able to find a developer to join in the project. These steps had

the necessary interdependence such that, in substance, a change of ownership occurred.

*McMillin–BCED*, 31 Cal.App.4th at 560–61, 37 Cal.Rptr.2d at 481. Accordingly, because of the close relationship between all of the steps and because each of the steps essentially would have been fruitless had the ultimate goal not been achieved, the court held that the interdependence test applied and the transactions were correctly stepped together for the purpose of the property tax reassessment. *Id.* at 562, 37 Cal.Rptr.2d at 482.

### III. Analysis

■ Before applying the facts of this case to each of the step transaction tests, we shall address briefly whether all or only one of the tests must be satisfied in order to apply the step transaction doctrine. Like the California Court of Appeal, we believe each test addresses different concerns and situations, but each also remains " 'faithful to the central purpose of the step transaction doctrine.' " *Id.* at 555, 37 Cal.Rptr.2d at 477 (quoting *King Enters.*, 418 F.2d at 517). For example, the interdependence test is useful in determining whether a series of transactions should be considered as one stepped-together transaction when each step, considered individually, would be illogical or "fruitless." This test may not be adequate when there are very few individual transactions or those transactions are spread over the course of many years. Under the binding commitment test, however, courts can uncover the true intent of the parties by looking at a binding commitment entered by the parties to achieve a certain result. Likewise, the end result test successfully overcomes the guise of seemingly separate transactions when the evidence reveals the true intent, goal, or desired result of the taxpayer. Accordingly, each test serves its purpose of evaluating otherwise separate transactions, taking into account the intent and goals of the parties, to determine whether all of the transactions should be considered one. For this Court to hold that all three tests must be met or require one to be met over the others would be to abandon the principles behind the

step transaction doctrine, thus allowing some taxpayers to subvert their tax obligations. Given the various situations covered by the tests and the tests' adherence to the principals of the step transaction doctrine, we hold that the doctrine may be applied when one or more of the tests is satisfied under the facts of each case.

We first examine the facts of the case *sub judice* under the binding commitment test. As we have mentioned, this strict test is satisfied when there is evidence that one step in a series of transactions is a "first step" and there is a binding commitment to take later steps. Often this test is applied when transactions occur over the course of several years. Although the transactions in this case took place over several years from the application for the subdivision in 1986 to the conveyances of lots two and four in 1992, the binding commitment test is not satisfied under the facts of this case. There was no evidence of a binding commitment by appellant to withdraw and convey his property to a new owner when he subdivided, which was the first step in this series of transactions. Even though we recognize that the subdivision plat referred to a "developer" and believe appellant's obvious intent at that time was eventually to sell the subdivided parcels, there was no obligation for him to do so. Accordingly, the facts do not satisfy the binding commitment test.

The facts of this case, however, satisfy the interdependence test. Under this test, transactions will be stepped together if the steps are so interdependent upon each other that an objective interpretation of each step leads to the conclusion that the legal relationship of each individual step would have been fruitless without any of the other steps. The purpose of the first step, the subdivision, is patent: landowners generally subdivide their property for later sale. Appellant testified to this intent before the Tax Court when he said that he renewed his FCMA agreement in 1986 because he "wanted a twenty year contract, because the original provision, our plan, was this subsequent development would be our retirement." Although it is possible for a property owner to subdivide his or her property without ever intending to sell the subdivided lots,

it seems, at least under the circumstances of this case with such valuable waterfront property, highly improbable that appellant did not intend to sell the subdivided lots.

The subsequent steps in this series of transactions likewise would have been fruitless if not for each of the other steps. In 1991, appellant exclusively listed lots two and four "to sell" with a real estate agent. It would be spurious to argue that the appellant did not intend to sell the lots when he listed them for sale. This step of listing the lots for sale would have been fruitless without the prior and subsequent steps.

Appellants next step was to execute the sales contracts on December 30, 1991, and February 7, 1992, for lots four and two, respectively. Clearly, the execution of a binding sales contract without the contemplation of selling the lots would be an inherently contradictory action. We can think of no reasonable explanation for the execution of a contract for the sale of land other than to facilitate the conveyance of that land.

Next, appellant drafted two letters on July 23, 1992, and August 12, 1992, six months after the execution of the binding sales contracts, to DNR requesting that lots two and four, respectively, be withdrawn. Appellant's withdrawal of the property at this time cannot be viewed for any purpose other than to convey the lots to the buyers with whom the sales contracts already had been finalized. We doubt that appellant, after subdividing, listing, and executing binding contracts for the sale of the lots withdrew his property .from the beneficial tax structure just to look at it; it is obvious he intended to finalize the sale by conveying the subdivided lots immediately after the withdrawal from the program which limited their development. Appellant in fact conveyed lot two on July 30, 1992, just seven days after the request for the withdrawal, for $385,000, and conveyed lot four on November 13, 1992, three months after the withdrawal, for $500,000. Each of the steps we have outlined were interdependent of the others and would have been pointless without the other steps and the ultimate conveyance of the subject property. Accord-

ingly, the interdependence test is satisfied under the facts of this case.

The facts in the case before us also clearly satisfy the end result test. Under the end result test, separate transactions should be stepped together to become one amalgamated transaction if the steps were prearranged parts of " 'a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.' " *Associated Wholesale Grocers*, 927 F.2d at 1523 (quoting *King Enters. Inc.*, 418 F.2d at 516). In applying the interdependence test, *supra*, we specified and evaluated each step appellant took with regard to lots two and four. Those steps do not bear repeating because their effect is obvious; appellant intended, from the subdivision to the actual conveyances, to sell the subject properties. Each step, therefore, was part of that prearranged plan to convey the property.

Even if it could be argued that when appellant first subdivided the lots he did not know he would be required to pay rollback taxes if he withdrew the property from the agreement for purposes of a conveyance, appellant became poignantly aware of that consequence when he conveyed another lot from that subdivided parcel. Appellant, prior to the transactions at issue in the case *sub judice*, directly conveyed lot three, which also was subject to the FCMA. He was assessed and paid the rollback tax. He was, accordingly, fully aware of the tax consequences under the agreement when property subject to it was sold. With that knowledge, appellant, in 1991, listed lots two and four, entered into the sales contracts, and took the other steps detailed above. Thus, after being required to pay the rollback tax from the conveyance of lot three, appellant apparently sought a perceived loophole that would allow him to avoid his tax liability and asked that lots two and four be withdrawn prior to the finalization of the already pending sale of the two lots. This clearly was done in an effort to avoid the tax appellant believed (or hoped) was only associated with an outright conveyance.

■ We believe the facts of this case demonstrate that the steps appellant took in listing, executing a contract for sale, and withdrawing the property were all steps made in hopes of achieving the end result of conveying the lots in a manner that would avoid the rollback tax. Simply stated, the procedure was a plan to avoid paying taxes. Because of the close relationship of each of the steps, appellant's knowledge that an outright conveyance would result in an rollback tax, the close proximity in time between the transactions, and the ultimate result of appellant's conveyance of property without the transfer of the FCMA obligations, and all of the reasons aforementioned, we conclude that the interdependence and the end result tests have been satisfied. Accordingly, all of the transactions should be stepped together and considered conveyances of property subject to the FCMA. As we have indicated, such transfers of property for the purpose of sale always have been subject to the rollback tax.

The Tax Court's reasoning is entirely consistent with our holding. In its written opinion, that entity stated in relevant part:

> In entering the FCMA, the State was placed in a position of having property protected from tree harvesting and other development during the period of time the agreement was in effect. The primary benefit received by the property owner came from the significant tax savings that an owner would enjoy by having property enrolled in this program. [Appellant] ... saved thousands of dollars that he would have otherwise had to pay in real estate taxes ... due to the benefits he .... received while the property was in this program.
>
> The change in the law that was made in July of 1988 did not in any way impair or infringe upon the primary purposes for both the State and the property owner in relation to the agreement.... The primary purpose for entering into the agreement in the first place was in no way affected.
>
> ... [T]he change in the State law that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment....

... [T]he law previously set forth that if there was a change in ownership of the property th[e]n there was to be a reassessment of the taxes that otherwise would have to be paid in connection with this property. This clearly indicates the intent of the Legislature that if there was a change in ownership, there should be some economic payback to the State.

In affirming the Tax Court, the circuit court, consistent with our reasoning, opined in relevant part:

The Maryland Tax Court correctly found that the primary benefit of the agreement to [appellant] was the frozen tax assessment on his property. Despite the changes to the agreement implemented by the 1988 amendment, [appellant] still received the frozen tax assessment. In order to receive the benefits that he reasonably expected from the FCMA he simply had to follow the agreement that he entered. It was only when he breached the agreement that [appellant] suffered rollback taxes.

The reasoning of the circuit court and the agency, although not couched in "step transaction" language, is entirely consistent with our holding.

What appellant attempted in the series of transactions, with some poor grace, we might add, was to attempt to enjoy the benefits of the agreement but to ignore the burdens he assumed when he entered into the agreement. These are the types of agreements that serve the interest of owners and the State alike. They do not cause deprivation of property value interests; rather, they accommodate such interests. These agreements, and others of similar intent, are the balance that property owners, who recognize their obligations in a property tax system, seek out to insure a continuation of ownership while property values increase to their benefit. We will not permit such appropriate devices to be emasculated by those who have received the benefits and then seek to avoid the burdens by declaring loopholes that have never, under the circumstances here extant, existed.

### IV.   Conclusion

The intent of the original Conservation of Woodland Areas Act, in effect when appellant entered into his initial FCMA and during the subsequent renewals, was to impose a rollback tax for property withdrawn for the purpose of conveyance, even if that conveyance was effected after the property technically was withdrawn.   Under the interdependence and end result tests, the series of transactions conducted by appellant should be stepped together and substantively considered one transaction: a withdrawal for the purposes of sale and conveyance.   Accordingly, the rollback taxes imposed by appellee and affirmed both by the Tax Court and circuit court were not in error.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**