833 A.2d 1014

**COMPTROLLER OF the TREASURY**

v.

**CLYDE'S OF CHEVY CHASE, INC. et al.**

**No. 11, Sept. Term, 2003.**

Court of Appeals of Maryland.

Oct. 15, 2003.

Brian L. Oliner, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

Linda M. Schuett, County Atty., Annapolis, Thurman W. Zollicoffer, Jr., City Solicitor, Baltimore, David A. Plymyer, Deputy County Atty., Annapolis, Edward J. Gilliss, County Atty., Towson, Kimberly A. Millender, County Atty., Westminster, Charles W. Thompson, Jr., County Atty., Rockville, A. Frank Craven, III, County Atty., Bel Air, Brief of Amicus Curiae Anne Arundel County, Baltimore City, Baltimore County, Carroll County, Harford County and Montgomery County for petitioner.

K. Donald Proctor (K. Donald Proctor, P.A., Towson; Thomas B. Stone, Jr., Law Office of Thomas B. Stone, Jr., Rockville); all on brief, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

This case arises out of an admissions and amusement tax sought to be levied by the Comptroller of the Treasury, petitioner, against two restaurants, Clyde's of Chevy Chase, Inc. (Chevy Chase) and Clyde's of Columbia, Inc. (Columbia).[1]

---

**1.** For the purposes of this opinion, both the Chevy Chase and Columbia locations, along with the Restaurant Association of Maryland, Inc., will be collectively referred to as respondents. On April 30, 2001, the Restaurant Association of Maryland, Inc. (the Association) filed a Re-

Clyde's received a hearing before a hearing officer on December 8, 1999 to determine the validity of the assessment. On May 5, 2000, the hearing officer upheld petitioner's assessment and respondent appealed to the Maryland Tax Court. After a November 1, 2000 hearing, the Tax Court issued a written order on November 29, 2000 reversing the hearing officer and denying petitioner's admissions and amusement tax assessment against respondent.

Petitioner sought judicial review in the Circuit Court for Baltimore City and on August 23, 2001, a hearing was held in front of the Honorable Clifton Gordy. Judge Gordy upheld the Tax Court's decision in an order dated October 2, 2001. Respondent appealed that decision to the Court of Special Appeals. In an unreported opinion filed on January 7, 2003, that court upheld the Tax Court's decision in favor of respondent.[2]

Petitioner then filed a Petition for Writ of Certiorari with this Court, and, on May 7, 2003, we granted the petition. *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.,* 374 Md. 358, 822 A.2d 1224 (2003). Petitioner presents one question for our review:

> "Did the lower courts erroneously hold that the gross receipts that are derived from the sale of refreshments and that pay for entertainment at a restaurant are not subject to the State's admissions and amusement tax because the refreshments are not sold 'in connection with entertainment'

---

sponse to Petitioner's Memorandum for judicial review, and, in the alternative, a Motion to Intervene in the Circuit Court for Baltimore City. Petitioner opposed the Association's motion, but the Circuit Court, pursuant to Maryland Code (1984, 1999 Repl.Vol.), § 10–222(d)(1) of the State Government Article and Maryland Rule 2–214(b), granted the Motion to Intervene. The Court of Special Appeals affirmed and petitioner did not appeal the issue to this Court.

Anne Arundel County, Baltimore City, Baltimore County, Carroll County, Harford County and Montgomery County filed a Brief of Amicus Curiae on behalf of petitioner.

**2.** As previously mentioned, *supra* note 1, the intermediate appellate court additionally affirmed the Circuit Court's grant of the Association's Motion to Intervene.

within the meaning of § 4–101(b)(1)(v) of the Tax General Article?"

We answer the question in the negative and hold that § 4–101(b)(1)(v) requires a direct financial nexus between the sale of refreshments and entertainment provided by the establishment. Under the specific facts of the case *sub judice*, where the restaurant providing the music charged no cover or admissions charge, required no minimum purchase by its patrons during periods of live music and did not inflate its refreshments' prices during the playing of the live music, the Tax Court's determination that the refreshment sales were not "in connection with" the entertainment is correct. Accordingly, we affirm the judgment of the Court of Special Appeals.

## I. Facts

Clyde's Restaurant Group [3] (Clyde's) operates the two Maryland restaurants involved in the dispute in the case *sub judice*. One restaurant is located in Chevy Chase while the other is located in Columbia.

### A. Clyde's of Chevy Chase, Inc.

The Chevy Chase location, which opened in 1995, is a two-floor restaurant comprising of around 16,000 square feet. The main dining area is located at street level just inside the primary entrance. This area is a nonsmoking area that accommodates 298 customers. The bar area, known as the Race Bar due to its classic auto racing theme,[4] is located one floor below street level. The Race Bar, where smoking was permitted, contains a hardwood floor section with an oval bar in the center of the room with approximately 80 to 90 bar stools surrounding it. Encircling the bar is a carpeted section with 120 booths for dining. At the end of the room is a raised stage/display area which is approximately six feet deep. Mu-

---

3. The status of Clyde's Restaurant Group as a business entity is not described in the parties' briefs.

4. In fact, both levels of the Chevy Chase restaurant have a classical travel theme from the 1930's and 1940's.

sicians hired by Clyde's perform in this stage area on certain nights.

To enhance the restaurant's ambiance, increase revenue, expand patronage, and maintain a varied atmosphere in the Race Bar area, the Chevy Chase location provides music. Three nights per week the music is live in the Race Bar. The restaurant provides background music played through a cable music system at lunch and on the remaining nights of the week. The type of music played is dependent on the night of the week and occasion. The cable system generally plays easy-listening and background music.[5] On Friday nights, a traditionally busy night for restaurants, the restaurant hires a disc jockey to play CDs in the Race Bar.[6] The manager specifies the general type of music to be played, but the disc jockey decides the specific songs to be played. Testimony revealed that the music played on Friday nights tended to be played at a much higher volume than that of the cable music system. On Saturday nights, a "three to five piece group" plays an upbeat style of music.[7] The final night of live music consists of either a Wednesday night easy-listening duo or a Thursday night jazz duo or trio. All musicians play on the stage area.

The restaurant announces the musical performances on the back of the restaurant's menu and on the restaurant's web site. "[F]ree unsolicited listings in local newspapers," including, but not limited to, the Washington Post, the Burtonsville Gazette and the Germantown Gazette are also made (alteration added).[8] These publications list the names of the per-

---

5. When a disc jockey or live musicians are working in the Race Bar, the cable music system is played only in the street level dining area.

6. It would appear that CD music is mechanical music. That issue, however, was not presented in this appeal.

7. Witness testimony established that Friday and Saturday nights tended to be the busiest nights of the week at the restaurant.

8. Clyde's does not pay for these listings. Apparently, they are provided free of charge by the publications because it is considered to be in the interests of the publications.

formers and the date and time of the performances. The restaurant does not encourage dancing. There is no dance floor in the Chevy Chase location, although, occasionally, patrons will spontaneously dance in the restaurant.

The restaurant does not impose any admission fee or cover charge when it provides live entertainment. It similarly does not increase the prices of any food or drinks, nor does it require any minimum purchase in order for a patron to be present for the live entertainment. A person could be present for the entertainment without purchasing any product or service from the restaurant. Musicians, or the disc jockey (DJ), are paid out of the till at the end of the night regardless of the amount of sales from food or beverages.

The prices at the Clyde's restaurant in Chevy Chase are competitive with the prices of similar local establishments. Competition with other local restaurants and overhead costs, including the cost of food, drinks, utilities, payroll, supplies, menus and music, drive the restaurant's price setting. The restaurant considers all of these factors, compares them with what the market can bear, and accordingly determines the prices for its food and beverages.

### B. Clyde's of Columbia, Inc.

The Columbia restaurant is a one-floor establishment located in the Columbia Town Center. The restaurant can accommodate about 320 for dinner and the bar has approximately 40 bar stools. This restaurant has a cable music system similar to that of the Chevy Chase location for the purpose of providing background music to enhance the atmosphere and dining experience. Thursday night is the only night the Columbia location provides other music. This usually consists of one or two acoustical guitarists playing contemporary music from 9:30 p.m. until 12:30 a.m. Customers generally may request songs to be played. No location for dancing is provided and dancing is not encouraged.

Similar to the Chevy Chase location, the Columbia restaurant does not charge an admissions or cover charge, raise its

prices or require any minimum purchase on Thursday evenings when the musicians play. Its prices are competitive in relation to the other local restaurants. The performers are paid in a similar manner to the entertainers in the Chevy Chase location. If there is not enough cash in the cash drawer to pay the performers, funds are taken from stored cash in the main office. There are no local publications that regularly announce the Columbia restaurant's entertainment. The restaurant only announces its live music on the restaurant's menu board. The general manager of the Columbia restaurant testified that the percentage and rate of sales for food and beverages at the Columbia location do not differ between the nights when live music is offered and the nights when it is not offered.[9]

### C. The Comptroller's Audit and Assessment

The Comptroller's audit revealed that the proprietor of the Chevy Chase location had not regularly collected or remitted the admissions and amusement tax [10] on sales of refreshments (food and beverage) made in the Race Bar of the restaurant during the periods when the restaurant provided live entertainment. During the audit, the Comptroller reviewed the sales records for a sample week chosen by the restaurant and then somehow made a determination of the percentage ratio of the sales made in the Race Bar when live music or the services of a DJ were provided, to the total refreshment sales

---

**9.** Anthony Moynagh, the general manager of the Columbia restaurant, testified to the following during redirect examination:

"Q. Mr. Moynagh, Mr. Oliner asked you about breaks and sales during breaks. What, if any, differences are there between ... nights when the live music is offered between sales when the music is being performed as opposed to during breaks?

A. None.

Q. Your testimony is that the rate of sales is consistent throughout the evening when the performers are there whether they're playing or not?

A. Yeah."

**10.** The Chevy Chase location was subject to a Montgomery County admissions and amusement tax pursuant to Montgomery County Code § 52–16A.

for that week. To arrive at the total amount of admissions and amusement tax it alleged was due for the assessment period, this percentage was then multiplied by the Chevy Chase location's total annual gross sales for the assessment period. From this an assessment was made and a total tax due amount determined. The amount in admissions and amusement tax already paid by the Chevy Chase proprietor was then subtracted from the total tax alleged to be due to arrive at the claimed deficiency. On October 27, 1999, the Comptroller alleged a total tax due from Clyde's of Chevy Chase, Inc. in the amount of $48,524.34.

The Comptroller's audit of the Columbia location revealed that the proprietor of that restaurant had, on a regular basis, remitted the admissions and amusement tax [11] on refreshment sales made during the time that live entertainment was provided. The auditor, however, determined that the proprietors had underpaid the tax, and thus issued a tax assessment. The Comptroller used the same process in determining the assessment against the Columbia location as he did for the Chevy Chase location. On October 28, 1999, the Comptroller alleged a total tax due from Clyde's of Columbia, Inc. in the amount of $4,886.35.

## II. Discussion

The determinative issue on review in this case is whether the Tax Court correctly interpreted the meaning of the phrase "in connection with entertainment" contained within Md.Code (1988, 1997 Repl.Vol., 2003 Supp.) § 4–101(b)(1)(v) of the Tax–General Article. We hold that the Tax Court correctly interpreted § 4–101(b)(1)(v), and that there is substantial evidence in the record to support the Tax Court's findings of fact that respondents' gross receipts derived from the sale of refreshments during live entertainment were not "in connection with entertainment."

---

11. The Columbia location was subject to a Howard County admissions and amusement tax pursuant to Howard County Council resolutions 96–1990 and 85–1999.

## A. Standard of Review

[1] In the case *sub judice,* we review the decision of the Tax Court, which is an administrative agency. *See Supervisor of Assessments of Baltimore County v. Keeler,* 362 Md. 198, 207, 764 A.2d 821, 825–26 (2001); *see also Read v. Supervisor of Assessments of Anne Arundel County,* 354 Md. 383, 391, 731 A.2d 868, 872 (1999); *Prince George's County v. Brown,* 334 Md. 650, 658 n. 1, 640 A.2d 1142, 1146 n. 1 (1994); *Shipp v. Bevard,* 291 Md. 590, 592 n. 1, 435 A.2d 1114, 1115 n. 1 (1981); *Shell Oil Co. v. Supervisor of Assessments of Prince George's County,* 276 Md. 36, 38, 343 A.2d 521, 522 (1975). "The standard of review of a decision of the Tax Court is, of course, a very limited one." *318 North Market Street, Inc. v. Comptroller of the Treasury,* 78 Md.App. 589, 593, 554 A.2d 453, 455 (1989). Maryland Code (1984, 1999 Repl.Vol.), § 10–222(h) of the State Government Article directs that, when reviewing an administrative agency's decision, a court may:

"(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

The decisions of the Tax Court are subject to this standard of judicial review pursuant to Md.Code (1988, 1997 Repl.Vol.) § 13–532(a) of the Tax–General Article, which states, "A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10–222 and 10–223 of the State Government Article."

In *Keeler,* this Court, in reference to judicial review of a final order of the Tax Court, stated:

" '[A] reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law. *See, e.g., Supervisor of Assess. v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984); *Comptroller v. Mandel Re–Election Com.,* 280 Md. 575, 374 A.2d 1130 (1977). On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision.'

*Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985).

"Accordingly, in this case, we are limited to determining the legality of the decision of the Tax Court and whether there was 'substantial evidence' in the record to support its findings and conclusions. *Comptroller of the Treasury v. Disclosure, Inc.,* 340 Md. 675, 683, 667 A.2d 910, 914 (1995); *State Dep't of Assessments and Taxation v. Consumer Programs,* 331 Md. 68, 73, 626 A.2d 360, 362 (1993); *see also CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324, 329 (1990); *Supervisor of Assessments of Montgomery County v. Group Health Ass'n, Inc.,* 308 Md. 151, 156, 517 A.2d 1076, 1078 (1986); *St. Leonard Shores Joint Venture v. Supervisor,* 307 Md. 441, 446, 514 A.2d 1215, 1218 (1986); *Ramsay,* 302 Md. at 838–39, 490 A.2d at 1302. In short, a reviewing court is authorized to reverse a decision of the Tax Court, if the agency 'erroneously determines or erroneously applies the law.' *State Department of Assessments and Taxation v. Consumer Programs,* 331 Md. 68, 72, 626 A.2d 360, 362 (citing *Roach v. Comptroller,* 327 Md. 438, 610 A.2d 754 (1992)); *see also Friends School v. Supervisor,* 314 Md. 194, 199, 550 A.2d 657, 659 (1988); *Supervisor of Assessments v. Asbury Methodist Home, Inc.,* 313 Md. 614, 626–628, 547 A.2d 190, 196 (1988); *Supervisor v. Chase Assoc.,* 306 Md. 568, 574, 510 A.2d 568, 571 (1986);

*Ramsay,* 302 Md. at 834, 490 A.2d at 1301; *Macke Co. v. Comptroller,* 302 Md. 18, 22, 485 A.2d 254, 257 (1984)." *Keeler,* 362 Md. at 207–08, 764 A.2d at 826 (alteration added); *see also Comptroller of the Treasury v. Gannett Co., Inc.,* 356 Md. 699, 707–08, 741 A.2d 1130, 1134–35 (1999). We do not specifically address the Tax Court's findings of fact as neither petitioner nor respondent challenges the validity of those factual findings, and, in addition, the record is replete with evidence supporting such findings. Petitioner's challenge is confined then to the Tax Court's legal interpretation of the admissions and amusement tax statute.

When this Court has interpreted statutes, we have annunciated that the " 'paramount goal ... is to identify and effectuate the legislative intent underlying the statute at issue.' " *Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557, 566 (2003)(quoting *Derry v. State,* 358 Md. 325, 335, 748 A.2d 478, 483 (2000)). The legislative intent can be ascertained through an analysis of the plain language of the statute and from consideration of its context within the statutory scheme as a whole. *Moore,* 372 Md. at 677, 814 A.2d at 566; *see also In re Mark M.,* 365 Md. 687, 711, 782 A.2d 332, 346 (2001). Where " 'the words of a statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning,' we 'will give effect to the statute as it is written.' " *Moore,* 372 Md. at 677, 814 A.2d at 566 (quoting *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994)). In situations where the statutory language is ambiguous, however, this Court looks beyond the statute's plain language in discerning the legislative intent. *Moore,* 372 Md. at 677, 814 A.2d at 566; *see also In re Mark M.,* 365 Md. at 711, 782 A.2d at 346. Once the language is found to be ambiguous, it is then appropriate to look to the legislative history and other relevant factors that may reveal the intent or general purpose, such as "a bill's title and function paragraphs, amendments ... and other material that fairly bears on the fundamental issue of legislative purpose or goal." *Moore,* 372 Md. at 677, 814 A.2d at 566 (quoting *In re Anthony R.,* 362 Md. 51, 58, 763 A.2d 136, 140 (2000)(internal

citation omitted)). A "[c]onstruction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided." *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887, 895 (1999) (alteration added)(quoting *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992)); *see also Moore,* 372 Md. at 677–78, 814 A.2d at 566.

When specifically interpreting tax statutes, this Court recognizes that any ambiguity within the statutory language must be interpreted in favor of the taxpayer. In *Gannett,* we stated:

> "When ambiguities arise in construing tax statutes, Maryland courts must interpret tax code provisions that aid in determining taxable income in the taxpayer's favor. We noted in *Comptroller v. John C. Louis Co.,* 285 Md. 527, 539, 404 A.2d 1045, 1053 (1979), that
>
>> 'when . . . the applicability of a tax statute and not a tax exemption is being construed, it is the established rule not to extend the tax statute's provisions by implication, beyond the clear import of the language used, to cases not plainly within the statute's language, and not to enlarge the statute's operation so as to embrace matters not specifically pointed out. In case of doubt, tax statutes are construed "most strongly against the government, and in favor of the citizen." *Comptroller of the Treasury v. Mandel Re–Election Comm.,* 280 Md. 575, 580, 374 A.2d 1130, 1132 (1977); *Comptroller of the Treasury v. M.E. Rockhill, Inc.,* 205 Md. 226, 234, 107 A.2d 93, 98 (1954).'
>
> *See also Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 396, 306 A.2d 534, 538 (1973) ('[W]here there is doubt as to the scope of the statute, . . . it should be construed most strongly in favor of the citizen and against the state.') (citing *F. & M. Schaefer Brewing Co. v. Comptroller,* 255 Md. 211, 257 A.2d 416 (1969)); *McConihe v. Comptroller,* 246 Md. 271, 228 A.2d 432 (1967); *Fair Lanes, Inc. v. Comptroller,* 239 Md. 157, 210 A.2d 821 (1965); *Comptroller v. M.E. Rockhill, Inc.,* 205 Md. 226, 107 A.2d 93 (1954)."

*Gannett,* 356 Md. at 707–08, 741 A.2d at 1135 (emphasis added). *See also Xerox Corp. v. Comptroller of the Treasury,* 290 Md. 126, 136–37, 428 A.2d 1208, 1214 (1981). In this case, we hold that the text of § 4–101(b)(1)(v), and more specifically the phrase "in connection with entertainment," is ambiguous.

## B. Admissions and Amusement Tax

The statute at issue in the case *sub judice* is located within Title 4 of the Tax–General Article of the Maryland Code, entitled "Admissions and Amusement Tax." Section 4–102 of the statute provides that a Maryland county "may impose, by resolution, a tax on . . . the gross receipts derived from any admissions and amusement *charge* in that county." Md.Code (1988, 1997 Repl.Vol.) § 4–102(a) of the Tax–General Article (emphasis added).[12] Petitioner contends that the Tax Court misinterpreted the definition of what constitutes an admissions and amusement charge, specifically, its interpretation of the nexus required between entertainment and sales of refreshments [13] contained within § 4–101(b)(1)(v). The relevant text of § 4–101(b)(1) states:

"(b) *Admissions and amusement charge.*—(1) 'Admissions and amusement charge', unless expressly provided otherwise, means a charge for:

(i) admission to a place, including any additional separate charge for admission within an enclosure;

. . .

(v) *merchandise, refreshments, or a service sold or served in connection with entertainment* at a *nightclub or room*

---

**12.** Hereinafter, unless noted otherwise, all statutory references will be to Title 4 of the Tax–General Article.

**13.** The definition of the term refreshment is not in dispute in this case, as the parties agree that the term includes the type of food and beverages sold in respondents' restaurants. The only question in the case at bar, as presented in petitioner's brief, is whether the refreshments served at Clyde's had a sufficient financial nexus to the live entertainment provided therein to justify the assessment of the admissions and amusement tax.

*in a hotel, restaurant, hall, or other place where dancing
privileges, music, or other entertainment is provided."*
[Some emphasis added.]

Md.Code (1988, 1997 Repl.Vol.2003 Supp.) § 4–101(b)(1) of the
Tax–General Article.

Petitioner argues that "[t]he plain language of the statute
and the common sense, logical interpretation of that language
authorize the assessment of the admissions and amusement
tax on receipts Clydes collected from the sale of refreshments
during periods when entertainment is provided" (alteration
added). Specifically, petitioner asserts that the Tax Court's
decision misinterpreted the "in connection with entertain-
ment" language that "clearly and unambiguously" allowed for
the tax. We disagree.

■ The phrase "in connection with entertainment" is not
clear and unambiguous. Connection is defined, generally, as
"a relationship in which a person, thing, or idea is linked or
associated with something else" or "the action of linking one
thing with another." *The Oxford American College Dictio-
nary* 294 (Putnam 2003). Connection is also defined else-
where as "[t]he state of being ... joined; union by junction,
by an intervening substance or medium, by dependence or
relation, or by order in a series." *Black's Law Dictionary* 302
(6th ed., West 1990)(alteration added). Here, the refresh-
ments, including food, sold at the two Clyde's restaurants
must be "in connection with" the live entertainment at the
restaurants. The statute provides no guidance as to the level
of nexus necessary to satisfy the "connection" requirement.

A broad interpretation would allow virtually any relation, no
matter how minimal, between the refreshments and entertain-
ment to be taxable.[14] One could literally interpret this to
mean that all sums paid for any refreshments served at any
time in the same room, regardless of whether prices reflect

---

14. In essence, this interpretation would be the practical equivalent of a
 second sales tax on those gross receipts. *See Comptroller of the Trea-
 sury v. Burn Brae Dinner Theatre Co., Inc.,* 72 Md.App. 314, 329, 528
 A.2d 546, 554 (1987).

the cost of entertainment, are assessable for tax purposes under this statute.

A strict interpretation would allow only those connections with direct financial implications, such as raising the price of food during a performance or the imposition of an admission, cover or minimum charge, to be taxable. The statute's text provides no guidance in this regard. As the necessary level of dependence or relation between the refreshments and the entertainment is not set forth in the text of the statute, the statute is not clear, but inherently ambiguous.

■ A brief review of the history of Maryland's admissions and amusement tax and its federal predecessor is necessary to illustrate the extent of the direct financial nexus between refreshment sales and entertainment for profit that was intended by Maryland's admissions and amusement tax.

The admissions and amusements tax first appeared in Maryland when it was enacted in 1936; the tax was levied against gross receipts from:

> "any admission or cover charge for seats and tables, reserved or otherwise, at any restaurant, hotel, café, night club, cabaret, roof garden or similar place furnishing a floor show or similar entertainment. In cases where there is no charge for admission or cover charge to such place of entertainment, furnishing a floor show or similar entertainment, but a charge for admission is wholly or in part included in the price paid for refreshments, service or merchandise, an equivalent tax shall be levied and collected upon twenty per cent of the gross receipts from refreshments, service and merchandise."

1936 Md. Laws, Chap. 10, § 3. This earlier version of the statute might have better supported the position taken by petitioner. In 1949, however, the Maryland admissions and amusement tax statute was amended [15] into a form that is similar to the current statute. The 1949 statute stated:

---

**15.** The Maryland admissions and amusement tax statute has been amended numerous times from its 1936 inception until its current 2003

## "ADMISSIONS AND AMUSEMENT TAX

"338. There shall be levied, collected and paid a tax ... of the gross receipts of every person, firm or corporation derived from the amounts *charged* for (1) admission to any place, whether such admission be by single ticket, season ticket or subscription, (2) admission within an enclosure in addition to the initial charge for admission to such enclosure, (3) the use of sporting or recreation facilities or equipment, and (4) admission, cover charge for seats or tables, refreshment, service or merchandise at any roof garden, cabaret or other similar place where there is furnished a public performance *when payment of such amounts entitles the patron thereof to be present during any portion of such performance.* The term 'roof garden or other similar place' shall include any room in any hotel, restaurant, hall or other public place where music or dancing privileges or other entertainment, except mechanical music, radio or television, alone, and where no dancing is permitted, are afforded the patrons in connection with the serving or selling of food, refreshment or merchandise.

"339. (a) Any county shall be authorized by resolution to levy a tax on the gross receipts of every person, firm or corporation obtained from sources within said county but not within any incorporated city or town thereof, derived from the amounts charged for admission or refreshment, service and merchandise to the same extent and in the same manner as that levied by the State under the provisions of the preceding section; and any incorporated city or town shall be authorized, by ordinance or resolution, to levy a tax on the gross receipts of every person, firm or corporation obtained from sources within said city or town derived from the amounts charged for admission or refreshment, service and merchandise to the same extent and in the same manner as that levied by the State under the provisions of the preceding section; provided, however, that the rate of

---

form; we shall focus on the amendments most relevant to the case *sub judice.*

tax which may be levied by any county or incorporated city or town need not be the same as that imposed by the State.

"(b) The tax authorized to be levied by the provisions of this section shall be collected by the Comptroller and paid in the same manner as the tax levied by the State."[16]

1949 Md. Laws, Chap. 255 (emphasis added). By 1957 this statute had been recodified, without substantive change, as Md.Code (1957), Art. 81 § 402. In 1971, the Legislature repealed and reenacted Article 81 § 402 "to change the kinds of places and events to which the State tax on admissions and amusements is charged on amounts for entrance to such places or events." 1971 Md. Laws, Chap. 429.[17] In 1988, the

---

**16.** Prior versions of the admissions and amusement tax appeared to allow for taxation by both the State and the local taxing authorities. At one point the State was permitted to retain as much as eight-ninths of the tax collected. Chapter 429 of the Laws of Maryland of 1971 amended the admissions and amusement tax, thus eliminating the State's right to retain a fraction of the tax's proceeds above and beyond the cost of the collection of the tax. It stated that, "THE COMPTROLLER SHALL DEDUCT THE amount expended by the admission tax division to defray the cost of administration and collection of the admissions and amusement tax collected under this subtitle. The current version of § 4–102 limits the taxation power to "Counties," "Municipal corporations" and the "Stadium Authority," *see infra* note 20 for the text of § 4–102. The interpretation of the language found in § 4–101(b), defining the admissions and amusement charge authorized by § 4–102, is the issue of this appeal.

**17.** This version of the statute was similar to the version interpreted by the Court of Special Appeals in its *Burn Brae* case, discussed *infra*. The specific text of the statute in question in the *Burn Brae* case was:

" **§ 402. Levy and amount.**

(a) *Counties.*—Effective July 1, 1972, any county by resolution may levy a tax on the gross receipts of every person, firm or corporation obtained from sources within the county derived from the amounts charged for (1) admission to any place, whether the admission be by single ticket, season ticket or subscription, including a cover charge for seats or tables at any roof garden, cabaret or other similar place where there is furnished a performance, if payment of the amounts entitles the patron thereof to be present during any portion of the performance; ... and (4) refreshment, service or merchandise at any roof garden, cabaret or similar place where there is furnished a performance....

The term 'roof garden or other similar place' shall include any room in any hotel, restaurant, hall or other place where music or

General Assembly again rewrote and recodified this statute when it added the Tax–General Article to the Maryland Annotated Code. The "Admissions and Amusement Tax" was placed in Title 4 of the Tax–General Article and the language specific to the issue in the case *sub judice*, the language derived from Article 81 § 402, was recodified into § 4–101(b) of the Tax–General Article. That version of the statute read:

"4–101. Definitions....

(b) 'Admissions and amusement charge, unless expressly provided otherwise, means a charge for:

(1) admission to a place, including any additional separate charge for admission within an enclosure;

(2) use of a game of entertainment;

(3) use of a recreational or sports facility;

(4) use or rental of recreational or sports equipment; and

(5) merchandise, refreshments, or a service sold or served in connection with entertainment at a nightclub or room in a hotel, restaurant, hall, or other place where dancing privileges, music, or other entertainment is provided."

1988 Md. Laws, Chap. 2. The Revisor's Note as to these amendments states, in part, the following:

"[I]n item (1) of this subsection, the former references to 'cover charges' and 'a cover charge for seats or tables at any roof garden, cabaret or other similar place' are deleted as unnecessary in light of the inclusion of any 'charge' for admission to any 'place'.

... in item (1) of this subsection, the former condition if 'payment of the amount[s] entitles the patron [thereof] to be present during any portion of the performance' and the former limitations 'where there is furnished a performance'

---

dancing privileges or other entertainment, except mechanical music, radio or television, alone, and where no dancing is permitted, are afforded the members, guests, or patrons *in connection with* the serving or selling of food, refreshment or merchandise."
Md.Code (1957, 1980 Repl.Vol.), Art. 81 § 402(a) (repealed)(emphasis added).

are deleted as unnecessary in light of the right to attend all or part of a performance implicit in the reference to a 'charge for . . . admission'.

. . .

. . . in item (5) of this subsection, the former reference to entertainment as being 'afforded the members, guests, or patrons' is deleted as surplusage."

*Id.* (alteration added). These notes appear to reflect an interpretation that this assessment is directed at taxing charges allowing patrons access to the entertainment, *i.e.*, a direct financial connection between the charges and entertainment. The right to access implicit in an admission charge is the driving force behind the statute.

As we have noted and as the Court of Special Appeals stated, the admissions and amusement tax "although authorized by the General Assembly, is imposed by local authority." The Comptroller administers this tax on behalf of the local taxing authority, retaining a portion only to cover the cost of its administration of the tax. *See* Md.Code (1988, 1997 Repl. Vol.) § 2–102(1) of the Tax–General Article (stating, "In addition to the duties set forth elsewhere in this article and in other articles of the Code, the Comptroller shall administer the laws that relate to: (1) the admissions and amusement tax; . . .").

Substantive changes, not relevant to the issue before us, were added in 1994, which created a subsection "(c)," thus adding a "Game of Entertainment," under the definition of this tax. The current version of the admissions and amusement tax, last amended in 1999,[18] *i.e.*, the statute at issue in this case, states:

---

**18.** "Chapter 250, Acts 1999, . . . redesignated former introductory paragraph of (b) as present (b)(1), redesignated former (b)(1) through (5) as (b)(1)(i) through (v), respectively, and added (b)(2)." Md.Code (1998, 1997 Repl.Vol., 2003 Supp.), § 4–101 of the Tax–General Article, Effect of amendments.

The total music expenditures for 1999 for the Chevy Chase restaurant, including recorded music, totaled $66,871, while the gross sales for food and beverages totaled $7,091,728. The 1998 totals were $63,820 for all music and $7,249,873 for sales of food and beverages.

" § 4–101. Definitions.

(a) *In general.*—In this title the following words have the meanings indicated.

(b) *Admissions and amusement charge.*—(1) 'Admissions and amusement charge', unless expressly provided otherwise, means a charge for:

(i) admission to a place, including any additional separate charge for admission within an enclosure;

(ii) use of a game of entertainment;

(iii) use of a recreational or sports facility;

(iv) use or rental of recreational or sports equipment; and

(v) merchandise,[19] refreshments, or a service sold or served in connection with entertainment at a nightclub or room in a hotel, restaurant, hall, or other place where dancing privileges, music, or other entertainment is provided.

(2) 'Admissions and amusement charge' does not include a charge for admission to a political fundraising event.

(c) *Game of entertainment.*—'Game of entertainment' includes, in Anne Arundel County or Calvert County, the game of instant bingo permitted under a commercial bingo license.

(d) *Person.*—'Person' includes:

---

19. Under petitioner's rationale, merchandise, such as t-shirts, sweatshirts and the like, sold by a restaurant providing live entertainment are subject to this tax. Thus, in a restaurant with a two-floor layout similar to the Clyde's in Chevy Chase, the gross receipts from the sale of t-shirts in an upstairs gift shop to a patron later eating in the upstairs restaurant would be subject to the same tax as would the sale of the same shirt by vendors to patrons during live entertainment in the downstairs bar. Such does not appear to be the intent of the statute.

(1) this State or a political subdivision, unit, or instrumentality of this State;

(2) another state or a political subdivision, unit, or instrumentality of that state; and

(3) a unit or instrumentality of a political subdivision of this State or of another state.

(e) *Stadium Authority.*—'Stadium Authority' means the Maryland Stadium Authority, created under § 13–702 of the Financial Institutions Article."

Md.Code (1998, 1997 Repl.Vol., 2003 Supp.), § 4–101 of the Tax–General Article.[20] The tax is not aimed at overhead costs assumed by the establishment, but at the direct charging of the entertainment costs back to the patrons then availing themselves of that entertainment. This interpretation finds

---

**20.** While the interpretation of the language of § 4–101(b), the definition of the admissions and amusement charge, is the central issue in this case, § 4–102 is the statutory provision actually authorizing the county, municipal corporation or Stadium Authority to levy the tax to be collected by the Comptroller. Section 4–102 states:

" **§ 4–102. Authorization to impose admissions and amusement tax.**

(a) *Counties.*—A county may impose, by resolution, a tax on:

(1) the gross receipts derived from any admissions and amusement charge in that county; and

(2) an admission in that county for a reduced charge or at no charge to a place if there is a charge for other admissions to the place.

(b) *Municipal corporations.*—A municipal corporation may impose, by ordinance or resolution, a tax on:

(1) the gross receipts derived from any admissions and amusement charge in that municipal corporation; and

(2) an admission in that municipal corporation for a reduced charge or at no charge to a place if there is a charge for other admissions to the place.

(c) *Stadium Authority.*—The Stadium Authority may impose a tax on:

(1) the gross receipts derived from any admissions and amusement charge for an admission to a facility owned or leased by the Stadium Authority; and

(2) an admission for a reduced charge or at no charge to a facility owned or leased by the Stadium Authority if there is a charge for other admissions to the facility."

Md.Code (1998, 1997 Repl.Vol.), § 4–102 of the Tax–General Article.

support in the model for Maryland's admissions and amusements tax, the federal cabaret tax.

In *Villa Nova Night Club, Inc. v. Comptroller of the Treasury*, 256 Md. 381, 386, 260 A.2d 307, 309 (1970), we said, "It is quite apparent that § 402 [a similar version to that interpreted in the *Burn Brae* case] is structured in a fashion strikingly similar to § 1700(e)(1) of the Internal Revenue Code of 1939, as amended, 26 U.S.C. § 1700(e)(1), which imposed the federal cabaret tax, since repealed...." The federal cabaret tax was substantively amended after the creation of the Maryland admissions and amusement tax in 1936 and those amendments, for the most part, were reflected in the 1949 amendments to the Maryland statute. *See Villa Nova*, 256 Md. 381, 260 A.2d 307. Accordingly, this Court, in reference to the federal cabaret tax, has said that "[d]ecisions concerning this federal statute are instructive" as to its Maryland antecedent. *Comptroller of the Treasury v. The Mandel, Lee, Goldstein, Burch Re–Election Com.*, 280 Md. 575, 580, 374 A.2d 1130, 1133 (1977)(alteration added)(holding that the admissions and amusement tax did not apply to a fund-raising committee's event because the live organ music being provided, which was being played from behind a curtain, did not fit within the statutory definition of a performance as the patrons of the event did not attend the event to hear the music; the ambiguity in the statute was resolved in the taxpayer's favor). A brief history of the federal statute is in order.[21]

Section 1700 of the Internal Revenue Code, 26 U.S.C. § 1700, the federal cabaret tax, was first enacted as an admissions tax by Congress in 1917 and repealed in 1965. As stated in *Geer v. Birmingham*, 88 F.Supp. 189, 197 (N.D.Iowa 1950), *rev'd*, 185 F.2d 82 (8th Cir.1950)(emphasis added)(alteration added),[22] the original tax was subdivided into two parts:

---

**21.** For a detailed description of the legislative history of 26 U.S.C. § 1700, *see Geer v. Birmingham*, 88 F.Supp. 189 (N.D.Iowa 1950).

**22.** One year after *Geer* was reversed by the Eighth Circuit Court of Appeals, the district court *Geer* interpretation of the federal cabaret tax was reinstated by Congress. In *Roberto v. United States*, 518 F.2d 1109,

"Thus, from its inception, the admissions tax was imposed upon the general field of entertainment, which was further subdivided for purposes of the imposition of the tax into two different categories because of the nature of the entertainment subject to the tax. On the one hand was that form of entertainment to which a direct admission charge was made upon the patrons ... and on the other hand that form of entertainment to which no admission charge as such was made *but rather the charge for admission was included in whole or in part in the price paid by the patron for*

---

1110–11 (2d Cir.1975)(alteration added)(some citations omitted), the Second Circuit Court of Appeals stated:

"In 1951 this Section's [26 U.S.C. § 4232] predecessor (Section 1700(e)(1) of the 1939 Internal Revenue Code, 65 Stat. 452) was amended by the addition of the following sentence:

'In no case shall such term include any ballroom, dance hall, or other similar place where the serving of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a "roof garden, cabaret or other similar place." '

" ... To understand the amendment, reference must be made to the district court's decision in *Geer v. Birmingham* .... In that case Judge Graven held that a dance hall or ballroom which operated a fountain which sold only soft drinks and confections but no meals or sandwiches and in which the ratio of seating capacity to a dance hall capacity was only 17½%, was exempt from the cabaret tax, stating: 'It is further clearly and satisfactorily established that ballrooms are amusement establishments of a class and type which are separate, distinct, and dissimilar from "cabarets" and "roof gardens" and that they have been and are so commonly and generally regarded.'

In its House Report, Congress stated that it was the purpose of this amendment to make it clear that the holding of the *Geer* Court of Appeals was not to be followed but that the principles set forth by the district court in *Geer* were 'controlling in the determination of whether the establishment involved is operating as a cabaret or as a dance hall, and to avoid the broad construction placed upon the statute in the case of *Avalon Amusement Corporation v. United States*, (165 F.2d 653) [7th Cir. 1948]....' H.R.Rep. No.586, 82d Cong. 1st Sess., 2 U.S.Code, Cong. and Admin.Serv. p.1915 (1951)."

*See also, Ross v. Hayes*, 337 F.2d 690, 692 (5th Cir.1964)(stating that, " 'the purpose of the amendment is to make clear that the principles set forth by the district court in the case of *Geer* ... are controlling ... and to avoid the broad construction placed upon the statute ... in the court of appeals decision reversing the decision of the district court in the *Geer* case ....' ")(quoting the Report of the Committee on Ways and Means, H.R.Rep. No. 82–586, 1st Sess., at 126 (1951)).

*refreshment, service or merchandise.* 'What are commonly know as cabarets' comprised this secondary category."

In Section 622 of the Revenue Act of 1942, Congress made substantive changes to the federal cabaret statute; the *Geer* court quoted from the amended Section 1700(e)(1) when it stated:

> " 'A tax . . . of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The term 'roof garden, cabaret, or other similar place' shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except *instrumental*[23] or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment or merchandise. *A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance.*' "

*Geer,* 88 F.Supp. at 211 (emphasis added). The amendments, including the addition of the emphasized language, were "intended to support the position the Treasury Department had taken in its Regulations, that hotel dining rooms similar to those in the cases of . . . *Broadmoor Hotel* . . . and *Deshler Hotel* . . . should come within the category of a 'roof garden, cabaret or other similar place furnishing a public performance for profit.' " *Geer,* 88 F.Supp. at 211.

In *Deshler Hotel Co. v. Busey,* 36 F.Supp. 392 (S.D.Ohio 1941), the court found that the federal cabaret tax was improperly assessed even where a hotel offered live dance music

---

**23.** Live music alone would be classified as "instrumental." In other words, unless the entertainment or music provided by the establishment included singing, the federal tax might not even apply under the prior versions of the federal cabaret tax.

played by an orchestra with instrumental and vocal soloists during dinner hours in one of its three dining rooms, the Ionian Room, and advertised the playing of such music and singing. While the orchestra was playing, the hotel did not institute a cover charge, a minimum charge for purchases or any other special charge on patrons entering the room where the music was being played. Patrons only paid for the food or refreshments being served. Patrons of any of the three dining rooms were allowed to enter the Ionian Room during the performance. The prices were higher in the other two dining rooms because they were more exclusive than the Ionian Room, although the latter room was the location of the entertainment. In holding that there was no charge for admission, the court said:

"[I]t is clear that the law, as a prerequisite to imposition of the tax, requires that there must be a charge for admission, which may be wholly or in part included in the price paid for refreshment, service, or merchandise. This is the first essential requirement of the act. It has not been changed by regulation and it cannot be so changed by regulation as to eliminate the requirement of an admission charge. In this respect the law is definite and no room is left for administrative interpretation; there must be a charge for admission.

"The stipulated facts in the instant case show that the plaintiff made no cover charges, minimum charges, door charges, or special charges; therefore, there could have been no direct charge for admission. Persons might enter the Ionian Room, remain there for a time, and leave again without paying, or becoming liable for the payment of any sum whatever. There remains only the possibility that some sort of an admission charge might be included in the price of food, service, or merchandise purchased. This is refuted by the facts of the case."

*Id.* at 395–96 (alteration added). The court went on to hold that the performance in *Deshler Hotel* was not a performance for "profit" when it said:

"Since it has been found that no admission charge in any form was made, it follows as a matter of logic, that the performances could not have been given for a *direct* profit. Rather it would appear that the entertainment was furnished at the expense of the hotel as an ordinary accompaniment of the service of food and refreshment in the manner customary to hotels of the class to which the plaintiff belongs; something expected by the customer and essential to good and profitable business relations, but in itself yielding no profit. In this case, the expense of the entertainment was an overhead expense incidental to the class of business in which the plaintiff was engaged. This court is therefore of the opinion and holds as a finding of fact, that such performances were not for profit in any accepted sense of the word, but that the expense involved was borne by the plaintiff as overhead. In general, it may be said that no commercial firm undertakes expenditures in the form of overhead without expecting a profit from the business in which the expenditures are made, but it is not from these overhead items that profit is derived. The profit is derived from the business itself and it is partially consumed by the overhead expense; hence, such items are, in themselves, items of expense and not of profit."

*Id.* at 396 (emphasis added). The court's analysis interprets the need for both an admission charge and a direct financial nexus between the entertainment and profit. Without any charge for admission or a "direct profit" or nexus, the entertainment should be seen as an overhead cost, an expense much like the cost of employees, supplies and the like. The facts of the current case are strikingly similar to that of *Deshler Hotel.* There is no cover charge, minimum charge or the like for patrons to enter either of the Clyde's restaurants and avail themselves of the entertainment. The only possible charge would be the price generally paid for refreshments, which themselves are not required to be purchased. In essence, there is no direct charge for admission to the entertainment.

Similarly, eleven years prior to *Deshler* the District Court in *United States v. Broadmoor Hotel Co.,* 30 F.2d 440 (D.Colo.

1929), held that the tax did not apply to a hotel that provided free orchestra music to the public in its ballroom. Afternoon tea was served in public rooms at the price of seventy-five cents; the price was the same in all of the hotel's rooms, regardless of whether entertainment was provided. The rooms were available free from any cover or admission charge to all guests of the hotel and to the general public as well. The general public was not required to purchase anything; the dancing and entertainment were free of direct charge. The court stated:

"Music has been a common accessory of hotel dining rooms and lobbies, both before and after the enactment of this statute; so, if Congress had intended to cover the situation we are considering, they would have definitely said so. Therefore, how can it be said that the defendant, in addition to running a hotel, is conducting a roof garden, cabaret, or other similar entertainment.

"It is contemplated that the entertainment referred to shall be conducted for profit and admission charged. But it may be assumed from the statement of facts that 75 cents is not an excessive charge for tea; so, where is any admission charge, and where is any direct profit, found?

"This section of the Revenue Act calls for something that might be termed entertainment, as distinguished from the mere service of food in the manner and with the accessories customary and expected by the patrons of a hotel of the character of the Broadmoor. Otherwise, it would logically follow that every restaurant, that maintains a radio, victrola, or other musical instrument, would come within the provisions of this section. Such was not the intent of Congress."

*Id.* at 441. Although the courts in these cases were answering questions slightly different than in the case *sub judice,* the logic expressed by those courts is instructive on the question before us. The federal cases required a direct connection between the taxed sales and the entertainment provided. The courts held that the federal tax did not apply where an establishment did not require a cover or admission charge and did not require patrons to purchase refreshments, even where

the general purchase of refreshments could have been the only possible source of the revenue necessary to pay for the music.

As previously mentioned, in response to the above and other similar decisions, Congress, in 1942, amended the federal cabaret tax to include the definition of a "roof garden, cabaret or other similar place." Congress included the following phrase within the amendments, "*A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance.*" 26 U.S.C. § 1700(e)(1)(1942) (repealed). This all-encompassing provision demonstrates a Congressional intent to tax gross receipts in situations where there may be little or no direct financial nexus between the entertainment and refreshments; it taxes the receipts from any and all such sales when a defined entertainment is provided.

In *Jones v. Fox*, 162 F.Supp. 449, 460 (D.Md.1957)(footnote omitted), that court stated:

"In 1942, after several court decisions refusing to apply the tax to establishments which neither charged an admission fee nor increased the prices for food and drink so as to include a hidden charge for admission, Congress amended the statute by providing in substance that a public performance is deemed to be for profit despite the fact that any charges made are not increased by reason of the furnishing of such performance." [24]

The *Jones* court's interpretation of the federal all-encompassing provision illustrates that such language, if it had been included within the amended Maryland statute, might encompass respondents' gross receipts during the periods when live music was being played. The General Assembly, however, in spite of expressly being asked to do so, has never chosen to

---

**24.** The court decisions referred to here in *Jones* include both the *Deshler Hotel* and *Broadmoor Hotel* cases.

incorporate that language into the Maryland version of the tax.

As mentioned, major amendments were made to the Maryland admissions and amusement tax statute in 1949, which recodified the statute into a form resembling the present day statute. The statute, Article 81 § 338–348, closely resembled its federal counterpart, with a noticeable omission—the all-encompassing provision of the 1942 amended federal cabaret tax. The 1949 Maryland Legislature is presumed to be fully aware of the federal case law, such as *Broadmoor* and *Deshler*, and the Congressional reports [25] outlining the 1942 amendments to the federal cabaret tax.[26] Armed with that knowledge, the Legislature initially chose not to incorporate the all-encompassing provision of its federal counterpart and has never done so. The General Assembly, whatever its reasons, has chosen not to incorporate the federal language that might clearly make taxable the gross receipts under the factual situation in the case *sub judice.*

Respondents argue that not only did the 1949 Maryland General Assembly choose to exclude the all-encompassing provision, but that the 2003 Maryland Legislature similarly rejected language paralleling the omitted federal provision in its recent rejection of a proposed amendment to § 4–101(b)(1)(v). Respondent argues that this rejection supports the interpretation that Clyde's refreshment sales were not in connection with its entertainment. While not the determining factor, we agree that this legislative rejection of the proposed amendments lends support to the Tax Court's finding regard-

---

**25.** *See Geer, supra,* 88 F.Supp. at 195–204.

**26.** *See Maryland Division of Labor and Industry v. Triangle General Contractors, Inc.,* 366 Md. 407, 422, 784 A.2d 534, 542 (2001) (where we stated "we presume, that the General Assembly 'had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law.' "); *see also Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40, 46 (1978) (stating, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change").

ing the financial nexus required by § 4–101(b)(1)(v). In *Caffrey v. Dep't of Liquor Control for Montgomery County*, 370 Md. 272, 309, 805 A.2d 268, 290 (2002), this Court recently reaffirmed the use of the amendment-rejection theory as one tool in ascertaining the intent of the Legislature, when we said:

> "[W]hile ' "we have never held that the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, we have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted." ' *State v. Bell*, 351 Md. [709] at 721, 720 A.2d [311] at 317 [1998] (quoting *Demory Bros.*, 273 Md. [320] at 326, 329 A.2d [674] at 677 [1974]) (citing, in part, *NCR Corp.*, 313 Md. [118] at 125, 544 A.2d [764] at 767 [1988] ('While a committee's rejection of an amendment is clearly not an infallible indication of legislative intent, it may help our understanding of overall legislative history.'))."

We have long recognized that the rejection of proposed legislation has some relevance in respect to ascertaining the intent of the Legislature. In *Bosley v. Dorsey*, 191 Md. 229, 60 A.2d 691 (1948), we held that a legislative rejection of the addition of a statutory provision lent support to the argument that the Legislature's intent was not to include the provision. We said:

> "Sections 359 and 415, which relate to appeals from orders of the Commission, stand today as they were written in the Act of 1910. While the Legislature made amendments to the Public Service Commission Law in 1922, 1924 and 1927, and could then have authorized the People's Counsel to take appeals from orders of the Commission, it is significant that it did not do so. On the contrary, an effort at the 1947 session of the Legislature to authorize the People's Counsel to appeal from orders of the Commission was defeated. The bill was introduced in the Senate January 7, but was reported unfavorably February 26 by the Senate Committee on Judicial Proceedings and the unfavorable report was adopted. Senate Journal, 1947 Sess., 46, 1053. The rejection of the bill strengthens the conclusion

that the Legislature has not intended that the People's Counsel shall appeal from orders of the Commission."

*Id.* at 239–40, 60 A.2d at 696.

Similarly, in this case, the admissions and amusement tax, which was modeled after its federal counterpart, originally omitted the all-encompassing provision of that federal statute and, despite several amendments, the Legislature has failed to incorporate such a provision since 1949, including the 2003 General Assembly's very recent rejection of similar language.[27] The proposed 2003 legislation, House Bill 982 (HB 982), attempted to add the following language to § 4–101(b)(1)(v): "REGARDLESS OF WHETHER THE CHARGE FOR THE MERCHANDISE, REFRESHMENTS, OR SERVICE IS INCREASED BECAUSE ENTERTAINMENT IS PROVID-ED." This clause, it might be argued, would have included the gross receipts from the refreshment sales during the times when establishments such as Clyde's provided live entertainment. In fact, had the proposed amendment passed the Legislature, the Maryland admissions and amusement tax would look similar to the all-encompassing language of the 1942 amended federal cabaret statute. More important, the "Fiscal and Policy Note" for HB 982 specifically recognized that the proposed amendment was in reaction to the Court of Special Appeals' opinion in the case *sub judice;* it stated:

"In the case of *Comptroller v. Clyde's,* two restaurants, Clyde's of Chevy Chase and Clyde's of Columbia, challenged the imposition of the admissions and amusement tax when the restaurants provided free entertainment without a means to recoup the cost of the admissions and amusement tax from their patrons. The Maryland Court of Special Appeals upheld the lower court's ruling that the admissions and amusement tax should not have been imposed by the Comptroller since there was no financial connection between the entertainment provided and the sale of food to support imposition of the tax because Clyde's did not impose a cover

---

27. While HB 982 received approval from the House of Delegates, the bill never reached a vote in the Senate.

charge, did not raise prices during the period of entertainment, or did not have any minimum purchase requirements while entertainment was provided. The Comptroller and local government attorneys are currently appealing the court's decision. If the ruling is upheld, the Comptroller estimates that approximately $8.4 million in admissions and amusement tax collected during fiscal 2001 through fiscal 2003 would be subject to a refund." [28]

---

**28.** In addition, several letters from both proponents and opponents of HB 982 recognized that the proposed amendment to § 4–101(b)(1)(v) was in response to this litigation between the Comptroller and Clyde's. The Restaurant Association of Maryland, in its letter to the House and Ways Committee opposing the legislation, stated that the "reason this legislation is before the House Ways and Means Committee today is because of assessments imposed by the Comptroller on Clyde's of Chevy Chase and Clyde's of Columbia, Inc. in 1999," and then proceeded to outline the history of this case. A letter of opposition to HB 982 written on behalf of the Maryland State Licensed Beverage Association to the Senate Budget and Taxation Committee stated, in part:

> "House Bill 982 is an attempt to reverse the case known as *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.* [149 Md.App. 724] (Court of Special Appeals of Maryland, ... Jan. 7, 2003)....
>
> ...
>
> "The Comptroller will complain that it has been its longstanding administrative policy to apply the amusement tax in any situation where there is live music. Unfortunately, as noted by the Tax Court, the Circuit Court and the Court of Special Appeals, this was a policy that was never published or promulgated in any way by the Comptroller's Office."

Another letter of opposition from the Musicians' Association of Metropolitan Baltimore stated, "[t]he fact that the Baltimore [City] Circuit Court and the Court of Special Appeals came down on the side of a restauranteur, who argued the tax did not apply since restaurants do not charge admission, makes a strong statement in support of that argument" (alterations added). Examples of support letters also noted the litigation in this case. A letter from Maryland Association of Counties, Inc., submitted letters to both committees stating, "The bill does not impose a new tax, but simply rectifies a Court of Special Appeals case rejecting a longstanding Comptroller's Office practice. *Comptroller v. Clyde's,* (In the Court of Special Appeals, No. 01893, [149 Md.App. 724] September Term, 2001) Unreported, January 7, 2003." Another example, sent to both committees, is from a letter from the Deputy Mayor of Baltimore City, Jeanne D. Hitchcock, stating that House Bill 982 "is in response to an adverse court decision in 2001, Comptroller v. Clydes."

The Court of Special Appeals' unreported opinion also called for the General Assembly to resolve any ambiguity in the interpretation of the "in connection with entertainment" language. The Legislature obviously was aware of that opinion. In light of these factors before it, the General Assembly nonetheless rejected HB 982.[29] HB 982's failure to pass both houses of the Legislature is a continuation of over 50 years of rejection of that language.

The amendment rejection-theory is supported further by the Court of Special Appeals case of *Comptroller of the Treasury v. Burn Brae Dinner Theatre Co., Inc.*, 72 Md.App. 314, 528 A.2d 546 (1987), a case on which both petitioner and respondents rely.[30] The Court of Special Appeals, in *Burn Brae*, found that the Maryland admissions and amusement tax required a financial nexus between the refreshments and entertainment provided by a restaurant. The Legislature, nonetheless, did not change the relevant substantive language

---

As the Fiscal and Policy Note, these submissions and several other letters indicate, both the House of Delegates and the Senate were well aware that HB 982 was in response to the litigation on appeal in this case.

**29.** Petitioner, citing to *In re Wallace W.*, 333 Md. 186, 634 A.2d 53 (1993), argues that the Legislature's failure to pass HB 982 should not be given weight because the interpretation it would be overriding was not from this Court, but that of the Court of Special Appeals. In *Wallace*, where the purported legislative inaction was in response to a case of the Court of Special Appeals, this Court stated:

"It is conceivable that the Legislature believed this Court would correct any misinterpretation of [the statute] when the opportunity presented itself. Legislative acquiescence in judicial construction of a statute by the intermediate appellate court *might* be less indicative of legislative intent than its acquiescence to an interpretation by the highest court of the State."

*Id.* at 198, 634 A.2d at 59–60 (alteration added)(emphasis added). While this type of judicial action is less indicative of legislative intent as inaction in regard to a decision by this Court might be, in light of the Legislature's over 50 years history of omitting language akin to that of HB 982, we do find the amendment-rejection theory to be a supporting factor in this case for our upholding the determinations of the Tax Court and the Court of Special Appeals.

**30.** The Comptroller did not request a Writ of Certiorari to this Court in the *Burn Brae* case.

of the statute.[31] In *Burn Brae,* the intermediate appellate court, after discussing the history of the Maryland admissions and amusement tax, discussed the "in connection with" language of the statute when it said:

> "[A]t first blush, § 402(a)(4) would appear to levy a tax on refreshment receipts at any place furnishing a performance regardless of whether the purchase of refreshments entitles the patron to attend the performance. *This interpretation, which the Comptroller urges, is too broad for several reasons.*
>
> First, by its own terms, the tax applies to refreshment receipts at places where entertainment is afforded 'in connection with the serving or selling of food, refreshments or merchandise.' Md. Ann.Code art. 81, § 402(a)(4) (1980 Repl.Vol.). The critical inquiry then is whether the entertainment is afforded 'in connection with' the refreshments. That inquiry, in turn, leads immediately to the question: *what 'connection' must exist between the two?* We have demonstrated the striking similarities between the Maryland and federal admissions tax. The legislative history of the federal act provides an answer:
>
>> '[F]rom its inception, the admissions tax was imposed *upon the general field of entertainment,* which was further subdivided for purposes of the imposition of the tax into two different categories because of the nature of the entertainment subject to the tax. On the one hand was that form of entertainment to which a direct admission charge was made upon the patrons, as is the case with theaters, skating rinks or the like, and on the other hand that form of entertainment to which no admission charge

---

**31.** While the General Assembly amended the statute after the *Burn Brae* decision, the substantive meaning of the phrase "in connection with" has not been changed. The Revisor's Note of the 1988 Laws of Maryland, Chapter 2, explains, "This subsection [§ 4–101] is new language derived without substantive change from former Art. 81, § 402(e)(1) and (2), (a)(1) and the first sentence of (b), as they related to taxable charges, and (a)(3) and the second sentence of (b), except for the references to excluded types of entertainment" (alteration added).

as such was made but rather the charge for admission was included in whole or in part in the price paid by the patron for refreshment, service or merchandise. "What are commonly known as cabarets" comprise this second category.'

*Geer,* 88 F.Supp. at 197, quoted in *Villa Nova,* 256 Md. at 387, 260 A.2d 307. *Thus, to be taxable, the refreshment price must give the patron access to the entertainment.* What the 1971 amendment appeared to take away by moving the limiting language of § 402(a)(4) to § 402(a)(1) remained by virtue of the definitional paragraph of § 402(a)(4). *Refreshment receipts are taxed at places where access to the entertainment is paid for through the price of refreshments.*

"Second, cases construing the federal counterpart to Maryland's admission and amusement tax have consistently held that refreshment receipts are subject to the tax only when the sale of refreshments is directly related to the cabaret entertainment.... The following language from *LaJolla Casa de Manana v. Riddell,* 106 F.Supp. 132 (S.D.Ca.1952), *aff'd,* 206 F.2d 925 (9th Cir.1953), provides a unifying basis to these decisions:

'It is clear that Congress envisioned an essential unity between the service of refreshment and the enjoyment of the entertainment. The reason for this unity is the reason for the tax itself: that the payment for the refreshment should operate to entitle the patron to view the entertainment, or participate in the dancing, as the case may be.'

106 F.Supp. at 135.

"Third, it is important to remember that § 402(a) is an 'admissions and amusement' tax. We are called to consider the statute in the context of that purpose, *Mandel Re–Election Com'n [Committee],* 280 Md. at 579, 374 A.2d 1130, and to resist any interpretation that would extend the scope of the tax to 'embrace matters not specifically pointed out,' *Id.* at 580, 374 A.2d 1130, quoting *Gould v. Gould,* 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917). It is apparent that to

impose this tax upon receipts from refreshments that neither include an admission in its price nor entitle the purchaser to be present during a performance would make § 402(a)(4) a sales tax."

*Burn Brae,* 72 Md.App. at 325–27, 528 A.2d at 552–53 (alteration added)(some emphasis added). The Court of Special Appeals later defined its concept of the required nexus when it stated:

*"Further, there must be a financial nexus between the service of refreshments and the entertainment provided.* Otherwise this 'amusement' tax would become a 'sales' tax. For instance, *if buying refreshments entitles the patron to see the show, or if refreshment prices are inflated during performances, or if the sale of refreshments pays for the entertainment, then a connection exists between the entertainment and the serving of refreshments.* **Without such a connection, the tax does not apply.** The Comptroller's contention that § 402(a)(4) applies whenever refreshments are served in an entertainment area affronts the rule that tax statutes are construed against the State when there is doubt as to its scope. Therefore, that contention must be rejected."

*Id.* at 328–29, 528 A.2d at 553–54 (alteration added)(emphasis added). While the *Burn Brae* court was construing an older version of the statute and the central issue was whether the Burn Brae Dinner Theatre was a roof garden or other similar place, the case and its examination of the history of the admissions and amusement tax provide insight directly relevant to the question of the direct nexus required between the entertainment and refreshment sales in this case.

██ A person need not purchase refreshments, or pay any charge, in order to be present, although management certainly hopes that such a person will spend money at the establishment. Patrons visiting the same bar on a night without entertainment will pay the exact same price for their meal or other refreshments as would someone ordering the same menu items on a night when live music is provided. The

music at Clyde's is a secondary attraction.[32] The refreshments do not entitle the patron to hear the music or see the musicians and the refreshment prices are not inflated during the times when entertainment is provided.

Petitioner argues that respondents' restaurants fall within the last example of a sufficient financial nexus set forth in the *Burn Brae* case, "if the sale of refreshments pays for the entertainment." Petitioner highlights the fact that the musicians hired by Clyde's are paid out of the till at the end of the night to support this claim. The musicians are paid out of the till regardless of whether the restaurant makes a profit on that evening. In fact, testimony elicited the fact that musicians are often paid from extra cash kept on hand when the sales from that night are less than what is owed to the musicians. Under petitioner's rationale, no restaurant could ever pay for entertainment without subjecting itself to the tax on all of its receipts. Unless they receive some type of grant, etc., from other sources, restaurants generally pay the costs of operations from the revenue generated by the business. The statute's phrase, "if the sale of refreshments pays for the entertainment," might better apply at Clyde's if the musicians were conditionally paid in relation to the refreshments sold during their performance, *i.e.*, they received a percentage of that night's extra sales or they agreed to be paid a fixed amount only if the sales increased by a certain amount or if a specific charge for the music, *i.e.*, cover, minimum, admissions, etc., was imposed during the period when the live music was played. As we have noted, ambiguity in a taxing provision of a tax statute must be resolved in favor of the taxpayer. In this case, the facts illustrate that the musicians were hired at a predetermined rate, regardless of the amount of refreshment sales during their performance. There was no admission, cover or minimum charge to be present during the entertain-

---

**32.** In fact, while Clyde's entertainment is mentioned in some local publications, Clyde's does not pay for such announcements in those publications. The announcements are free and solicited by the publications themselves when representatives of those publications contact Clyde's and request information on live entertainment.

ment, nor were prices raised during the periods of live music nor was a person required to purchase refreshments in order to be present. Given this factual scenario, we hold that the financial nexus, as a mere overhead cost, between the entertainment and refreshment sales at Clyde's is too attenuated and the admissions and amusement tax does not apply.

Petitioner argues that the lower courts' decisions interpreting § 4–101(b)(1)(v) render superfluous "the exemptions expressed both in the statute and the regulations adopted interpreting the statute." We do not agree. Maryland Code (1988, 1997 Repl.Vol., 2003 Supp.) § 4–103(b)(1)(i) and (ii) of the Tax–General Article state:

" § **4–103. Limitations on authorization to tax.**

. . .

(b) *Counties and municipal corporations.*—The admissions and amusement tax may not be imposed by a county or municipal corporation on gross receipts:

(1) derived from any charge for merchandise, refreshments, or a service sold or served at a place where:

(i) dancing is prohibited; and

(ii) the only entertainment provided is mechanical music, radio, or television."

This language stems from the 1949 amendments to the Maryland admissions and amusement tax and was derived from a specific limitation on the definition of the type of entertainment able to be taxed under the statute. The relevant provision of the 1949 statute stated:

"The term 'roof garden or other similar place' shall include any room in any hotel, restaurant, hall or other place where music or dancing privileges or other entertainment, except mechanical music, radio or television, alone, and where no dancing is permitted, are afforded the patrons in connection with the serving or selling of food, refreshment or merchandise."

1949 Md. Laws, Chap. 255. This limitation merely excludes certain examples from the statutory definition of entertainment, and does not alter the nexus required, by the phrase, "in connection with," between that entertainment and the refreshment sales.

Additional evidence of this is found in the 1942 federal cabaret tax statute, on which the 1949 Maryland law was based. The federal statute which excluded "instrumental or mechanical music alone" from the definition of entertainment also included the aforementioned all-encompassing provision, which stated, "A performance shall be regarded as being furnished for profit for purposes of this section even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance." These exceptions would be unnecessary in relation to the all-encompassing provision if those limitations referred to the "in connection with" language and not merely the definition of entertainment.

Similarly, Code of Maryland Regulations (COMAR), 03.06.02.05B.(1)(e), which states that the "tax does not apply to gross receipts.... Of a restaurant in Baltimore City and Hagerstown which provides for its patrons entertainment in the form of an individual roving performer who does not employ or is not dependent on amplified sound," is not rendered meaningless by our interpretation of § 4–101(b)(1)(v). The fact that in Baltimore City and Hagerstown there is a specific exclusion of a certain type of entertainment from the assessment of the admissions and amusement tax in those two locations has no bearing on whether other live entertainment is "in connection with" refreshment sales in other parts of the State.

■ Petitioner also argues that the court should give deference to "the long-standing administrative interpretation of the Comptroller," which states "that receipts, such as those in question in this case, collected during times when entertainment is provided, are subject to the admissions and amusement tax." This Court has said:

"In determining the proper weight to be accorded an administrative interpretation or practice, various factors must be taken into account. One of these factors is the consistency of the administrative interpretation or practice with the purposes of the statute. Still another is the thoroughness, breadth, and validity of the considerations underlying the administrative interpretation or practice. The method by which the agency established its interpretation or practice reflects varying degrees of study and evaluation of the particularized problem. Certain methods indicate less thoroughness and breadth than others. Thus, if an administrative interpretation has not resulted from a contested adversary proceeding, or from a *promulgated* administrative decision, rule, regulation, or departmental statement, it is entitled to relatively little weight. Similarly, if the administrative practice has not been publicly established, it is not entitled to substantial weight."

*Comptroller of the Treasury v. Mack Truck, Inc.*, 343 Md. 606, 618, 683 A.2d 777, 782–83 (1996)(quoting *Comptroller of the Treasury v. John C. Louis Co., Inc.*, 285 Md. 527, 544, 404 A.2d 1045, 1055–56 (1979) (citations omitted)). Petitioner's argument, based on the testimony of an Assistant Chief Auditor of the Compliance Division, has insufficient merit as its "long-standing administrative interpretation" has not been publically promulgated through any regulation, rule or other publication. It does not meet the *Mack Truck* standard. Under such circumstances, the Comptroller's interpretation is of insufficient weight to carry the day in the present dispute.

 Finally, as we have previously indicated, this Court's holding that any ambiguity in taxing provisions of tax statutes shall be interpreted in favor of the taxpayer, *Gannett*, 356 Md. at 707, 741 A.2d at 1135, supports our interpretation of § 4–101(b)(1)(v). As we have held that the "in connection with entertainment" phrase within § 4–101(b)(1)(v) is inherently ambiguous, our interpretation, while consistent with the legislative intent, the relevant case law and other factors, must also resolve the ambiguity in favor of the taxpayer. We note petitioner's concern that our interpretation of the financial

nexus will cause the local taxing authorities to lose a source of revenue in these present, hard fiscal times. Such concerns however, are more appropriately addressed by the General Assembly; the Legislature is free to address the ambiguity within this statute if it perceives that the statute as it currently reads will cause a financial loss to the local taxing authorities—that the Legislature desires to avoid.

In addition, this decision is limited to its unique facts. Here, the Tax Court found that the respondent restaurants had competitive prices, did not raise those prices during performances, charged no cover charge or other express charge, and had no minimum purchase requirement imposed on patrons in order for them to be present.

### III. Conclusion

In conclusion, we hold that the Tax Court correctly found that taxing gross receipts of refreshments, where the restaurant did not charge patrons to enter the facility or increase the price of refreshments during the live entertainment, did not require a minimum charge to be present for the entertainment and did not require refreshments to be bought in order for a person to be present, was too attenuated a connection with the entertainment under the statute. The phrase "in connection with entertainment" is inherently ambiguous where the statute is silent as to the extent of the nexus necessary between refreshment sales and entertainment. After a careful review of the case law and legislative history, we hold that § 4–101(b)(1)(v) requires a direct financial nexus beyond mere overhead expenses for the music between the "merchandise, refreshments or a service sold" and entertainment provided by respondents.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

RAKER, Judge, concurring in the judgment only.

I agree with the Court that "this decision is limited to its unique facts." In particular, I am convinced that when the decision we review is that of the Maryland Tax Court, an administrative agency, "the [Tax Court's] decision is viewed in

a light most favorable to the agency, since decisions of administrative agencies are *prima facie* correct." *Supervisor of Assessments v. Keeler,* 362 Md. 198, 209, 764 A.2d 821, 827 (2001) (citations omitted); *see also Comptroller v. Digi–Data Corp.,* 317 Md. 212, 231, 562 A.2d 1259, 1269 (1989). Indeed, "[e]ven with regard to some *legal issues,* a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Division of Labor v. Triangle,* 366 Md. 407, 416, 784 A.2d 534, 539 (2001) (emphasis added).

I am also persuaded that where a tax statute's applicability, as opposed to a tax exemption, is ambiguous on its face, the ambiguity should be read in favor of the taxpayer. *See Comptroller v. Mandel Re–Election Com.,* 280 Md. 575, 584, 374 A.2d 1130, 1135 (1977). The phrase "in connection with entertainment" is inherently ambiguous and—under the circumstances presented in the instant case and due to the deference owed to the agency's decision—must be read in favor of Clyde's.

I do not join that part of the Court's opinion that relies upon the "amendment-rejection" theory of statutory interpretation. The inaction of the General Assembly with respect to a proposed amendment that may have clarified the meaning of § 4–101(b)(1)(v) of the Tax–General Article does not aid courts who must discover the intentions of the Legislature with respect to enacted provisions of the tax code. The reason for this is that the Legislature's intentions by not acting on a proposed amendment are almost impossible to divine. Perhaps the General Assembly, knowing that this Court had granted certiorari for this case and would soon be answering the statutory question, decided to wait on the proposed amendment until after our decision; perhaps the General Assembly considered the tax code sufficiently clear; perhaps the General Assembly believed the proposed amendment in need of additional language to achieve its purpose; perhaps the General Assembly simply decided to save the proposed

amendment for a more convenient time or for further study and deliberation. The point is, the rejection of an amendment tells this Court very little, and perhaps nothing, about the intentions of the General Assembly when it passed § 4–101(b)(1)(v), and it could just as easily indicate an intent contrary to the one divined by the Court. Such inferences from the legislative history are therefore unhelpful to the interpretive enterprise, and I would not rely on it here.

I do not join the rest of the Court's opinion because I find the standard enunciated therein does not clarify the meaning of § 4–101(b)(1)(v) of the Tax–General Article. "Direct financial nexus" is just as ambiguous as "in connection with," and I do not agree that the admissions tax will apply only where there is a specific charge for the performance or if the performers are conditionally paid in relation to the refreshments sold. Yet I am confident that should the General Assembly seek to impose Maryland's admissions and amusement tax upon establishments like Clyde's, it is fully capable of doing so by following the example of Congress in response to the federal district court's opinion in *Deshler Hotel Co. v. Busey*, 36 F.Supp. 392 (S.D.Ohio 1941), *aff'd*, 130 F.2d 187 (6th Cir.1942), and, like Congress in 1942, can enact a statute that clarifies the meaning of § 4–101(b)(1)(v) of the Tax–General Article.